UNITED STATES of America,

v.

ACCETTURO, Anthony, Taccetta, Michael, Perna, Michael, Ricciardi, Thomas.

Appeal of Anthony ACCETTURO, in No. 85–5670.

Appeal of Michael TACCETTA, in No. 85–5680.

Appeal of Michael PERNA, in No. 85–5681.

Appeal of Thomas RICCIARDI, in No. 85–5682.

Nos. 85–5670, 85–5680, 85–5681 and 85–5682.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1986.
Decided Feb. 14, 1986.

Thomas W. Greelish, U.S. Atty., D. of N.J., Michael A. Guadagno, Acting Atty. in Charge, Barbara Miller (argued), Sp. Atty., U.S. Dept. of Justice, Organized Crime Strike Force, Newark, N.J., for appellee.

Milton M. Ferrell, Jr. (argued), Miami, Fla., for appellant Anthony Accetturo.

Michael Critchley (argued), Critchley & Roche, Alan L. Zegas, West Orange, N.J., for appellant Michael Taccetta.

Raymond M. Brown (argued), Brown & Brown, P.A., Alan Dexter Bowman, Alan Dexter Bowman, P.A., Newark, N.J., for appellant Michael Perna.

Harvey Weissbard (argued), Weissbard & Wiewiorka, West Orange, N.J., for appellant Thomas Ricciardi.

Before WEIS, SLOVITER and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Appellants are the subjects of an indictment returned by a federal grand jury on August 19, 1985, charging them and 22 others with conspiring to violate the Racketeering Influence and Corrupt Organizations Act, 18 U.S.C. § 1962(d), and with conducting a racketeering enterprise in violation of section 1962(c) of that Act. On August 21, appellant Anthony Accetturo appeared before a United States Magistrate in the Southern District of Florida,

and appellants Michael Taccetta, Michael Perna and Thomas Ricciardi appeared before a United States Magistrate in New Jersey, at which time the United States moved for their pretrial detention pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.* The Magistrates held detention hearings and ruled in favor of appellants.[1]

On September 13, 1985, appellants were arraigned before the district court. The government again moved for their detention. The district court conducted separate, *de novo* hearings and, on October 18, 623 F.Supp. 746, rendered a decision in favor of detention of each appellant. The district court simultaneously stayed execution of its order until October 25, giving appellants an opportunity to file emergency motions for stays before this Court. We denied these motions on October 24.

Appellants now appeal the pretrial detention order of the district court. They challenge the procedures applied by the district court in the detention hearings, including its use of *in camera* evidence and its reliance on certain "overlapping evidence" produced at one appellant's hearing in its decision to detain other appellants. Appellants Accetturo, Taccetta and Ricciardi also challenge the constitutionality of the Bail Reform Act of 1984. We find two deficiencies in the proceedings below and remand these cases for reconsideration by the district court.

### I.

Section 3142 of the Bail Reform Act of 1984 amended prior law by requiring the judicial officer to consider the "nature and seriousness of the danger to any person or the community that would be posed by the person's release" in determining the appropriateness of pretrial detention. 18 U.S.C. § 3142(g). This

> change in the law was said to reflect "the deep public concern ... about the

1. The government appealed the Accetturo release order to the District Court for the Southern District of Florida, but its appeal was dismissed for lack of jurisdiction under 18 U.S.C. § 3145.

growing problem of crimes committed by persons on release" and the recognition that

> there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial.

S.Rep. No. 225, 98th Cong., 1st Sess. 6–7, *reprinted in* 1984 Code Cong. & Ad. News 3182, 3188–89 (Senate Report)....

*United States v. Leon,* 766 F.2d 77, 80 (2d Cir.1985) (emphasis omitted).

Section 3142 authorizes a judicial officer, after a hearing, to order detention if he or she "finds that no condition or combination of conditions will reasonably assure the appearance of the [defendant] ... as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). If the judicial officer finds "probable cause to believe that the person committed" certain enumerated offenses "for which a maximum term of imprisonment of ten years or more is prescribed," the Act provides a "rebuttable presumption ... that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." *Id.*

Section 3142 further directs the judicial officer to hold a detention hearing at which the defendant has the right to counsel, and "shall be afforded an opportunity to testify, to present witnesses on his own behalf, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise." 18 U.S.C. § 3142(f). Significantly, "the rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." *Id.* The judicial officer may detain a defendant only if his finding that "no condition or combination of conditions will reasonably assure

the safety of any other person and the community" is supported by "clear and convincing evidence." *Id.* Finally, the judicial officer must, in rendering his decision,

> take into account the available information concerning—
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person ...
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## II.

At appellants' detention hearings, the government relied primarily on the testimony of Federal Bureau of Investigation Special Agent Dennis Marchalonis and on transcripts of intercepted conversations involving appellants. Accetturo's hearing took place on October 3, 1985. Marchalonis testified that a longtime associate of Accetturo, later ascertained to be Joseph Alonzo, had provided sworn testimony regarding the development of a "well-run ... criminal organization" headed by Accetturo. (Accetturo Exhibits at H5 [hereinafter AE]). Alonzo alleged that appellant, who lives in Florida, had trained Taccetta and sent him to run a New Jersey based criminal organization. Marchalonis further testified, relying on electronic surveillance, to Accetturo's control over the New Jersey Taccetta organization.

Marchalonis described, again based in part on Alonzo's information, the extortionate takeover by the Accetturo organization of Aron & Aron, Inc., a Florida business.

Marchalonis also testified to threats to two government witnesses allegedly made by Accetturo organization members. As evidence of the intimidation of one witness, the government offered a tape recording

and transcript of an intercepted conversation concerning Accetturo's involvement in another extortionate takeover, this time of CVX, Inc., a California based corporation. This recording and transcript, along with affidavits regarding voice identifications, were offered to the court, and accepted by it, for *in camera* consideration on the ground that disclosure of them to appellants would jeopardize the witnesses heard on the tape. The government provided appellants with a summary of the contents of the *in camera* materials in its pre-hearing briefing. Marchalonis testified that codefendants under the control of Accetturo and Taccetta threatened the owner of CVX, Michael Esposito, and members of his family, and in fact beat Esposito in June, 1984. Marchalonis stated that as a result, Esposito, now incarcerated in New York for refusing to testify in an unrelated matter, was "in fear of his life." (Joint Appendix at 940 [hereinafter JA]).

The second government witness was told by a person allegedly connected to the Accetturo organization that "the boys were looking for him and they wanted to talk to him." (AE13). According to Marchalonis, a second source corroborated this story, stating that the organization knew the witness was cooperating and would have to be "silenced". (AE15).

Taccetta's hearing took place on October 10, 11 and 15. The government offered the transcript of Accetturo's hearing to establish Taccetta's rise in the organization. Marchalonis testified that Taccetta was the New Jersey "underboss" for Accetturo. The government offered the same *in camera* information concerning the takeover of CVX, Inc. and the threats to Michael Esposito that it offered in Accetturo's hearing. Marchalonis testified further to the threat to the second government witness and to the extortionate takeover of Aron & Aron, Inc. Marchalonis also stated that government surveillance, witness testimony and tape recordings linked Taccetta to cocaine and marihuana distribution, and that government sources further inculpated Taccetta in counterfeit credit card use and extortion of gambling operatives.

Perna's hearing took place on October 4, 1985. The government offered intercepted conversations that included a March 12, 1983 "Santa Claus Suits" conversation, in which Perna allegedly said of the organization's loansharking debtors:

> there are a lot of f___ stiffs in this f___ book! And they think we are suckers all the time! ... We're taking the Santa Claus suit ... off. There are a lot of guys who are gonna get hurt.

(Government Appendix at 93 [hereinafter GA]). Marchalonis further testified that a number of loansharking victims interviewed by police officers refused to admit they had borrowed money from the organization; when confronted with tape recordings of their conversations with members of the organization, some of the victims claimed that the loans were friendly ones and others claimed that they had forgotten about the loans. The government submitted a December 8, 1982 intercepted conversation, allegedly featuring Perna and Ricciardi discussing a problematic gambling operative, in which Perna stated, "he's supposed be scared," (GA107), and then agreed with Ricciardi when Ricciardi said the operative should be "put in blackness, that's what he deserves." (GA109). Marchalonis also discussed Perna's and Taccetta's extortion of gambling operatives and yet another intercepted conversation between Perna and Ricciardi involving the forced placement of a video gambling machine.

Ricciardi's hearing took place on October 9. The government introduced, among other things, the December 8, 1982 "put into blackness" and the March 11, 1983 video gambling machine transcripts, and a government proffer, made at the hearing before the Magistrate, that it had learned, on August 26, 1985, that members of the organization had "already made attempts to ascertain the name of, quote, the rat, who had testified against them in this matter." (JA207). The government also produced evidence of two 1977 assault convictions of Ricciardi, one of which allegedly

arose out of a beating of a debtor of Accetturo who was also believed by Taccetta possibly to be cooperating with the police.

After the hearings were concluded, Accetturo submitted a sworn deposition of one of the principals of Aron & Aron, Mitchell Aron, to disprove the government's allegations of extortion. In response to this submission the government submitted for *in camera* consideration an October 17, 1985 letter to the district court from the United States attorneys in the case, an FBI 302 form detailing an interview with government witnesses knowledgeable about the Aron & Aron takeover, and an affidavit from one of the United States attorneys in support of the government's request for *in camera* consideration of these materials. This affidavit discussed threats to witnesses mentioned in the FBI 302 form. The government also submitted an unsealed copy of a 1984 Information and Complaint Affidavit charging Mitchell Aron with fraud. Appellants were notified of the *in camera* submission, and received a redacted copy of the October 17 letter, summaries of the FBI 302 form and of the affidavit in support of *in camera* consideration, and a copy of the 1984 Information and Complaint.

Although the district court held separate hearings for all four appellants, it consolidated its detention order into a single opinion. Noting that the evidence presented "frequently overlaps as to two or more of the defendants," the court bifurcated its opinion, first discussing the "evidence which overlaps as to multiple defendants," and then individually evaluating the defendants. (JA1269).

In the overlapping evidence section, the court detailed the history of the Accetturo organization and discussed the organizational role of each of the appellants, finding that "Michael Taccetta, Martin Taccetta (appellant's brother), Michael Perna and Thomas Ricciardi formed the inner circle, but the key individual in the hierarchy is Anthony Accetturo." (JA1272). The court acknowledged that the credibility of the source of this evidence, Joseph Alonzo, had

been challenged, but it refused to dismiss him as unreliable in all respects. The court also discussed appellants' loansharking activities and related violence, including the fact that debtors of the organization refused to provide information to the police because of "fear of violent retribution." (JA1275). The evidence convinced the court that "a close-knit, hierarchal structure exists with Mr. Accetturo at its apex." (JA1275–76).

The court next discussed the "put into blackness" tape, the video gambling machine tape, and other taped conversations. The court credited Alonzo's description of the takeover of Aron & Aron, admitted the Aron & Aron *in camera* material after finding the government's summary of them adequate, and found "that the evidence and proffers are persuasive that Mr. Accetturo, Mr. Taccetta, and Mr. Ricciardi conceived the plan to take over a business and enrich themselves through extortion, threats of violence and violence." (JA1283). The court similarly admitted the *in camera* submissions relating to the takeover of CVX, Inc., and to the beating of Michael Esposito, again after approving the government's summary. The court found that the Taccetta group intended to murder Esposito upon his release from prison, (JA1286), and stated that "the evidence admitted in this proceeding overwhelmingly demonstrates that as in Aron & Aron, this organization moved in on a business, took it over and utilized threats and violence to achieve their ends. It is highly believable that Esposito ... genuinely fears for his life and that of his family." (JA1287). The court credited as well Agent Marchalonis' description of the threat to the second government witness.

The court concluded its "review of this multiple defendant evidence" by characterizing the government's proofs as substantially bearing "a stamp of reliability." (JA1290). The court was

> clearly convinced that the totality of this portion of the evidence demonstrates the existence of a hierarchal organization

whose overall boss is Anthony Accetturo....

Directly under him is Michael Taccetta, who runs the day-to-day operation of the operation in New Jersey subject to Mr. Accetturo's approval.

Perna and Ricciardi have important supervisory responsibilities.

I'm also convinced that for the purposes of this hearing that the government as to this evidence has made a sufficient showing that these individuals have been engaged in a pattern of criminality which constitutes a danger to the public and others.

(JA1291). The court then applied the four factor analysis mandated by section 3142 to each of the appellants, and found them to be detainable.

### III.

Appellants Accetturo, Taccetta and Ricciardi, who are not currently scheduled for trial until April 15, 1986, attack the constitutionality of the Bail Reform Act, both facially and as applied, on the ground that it fails to direct judges to consider, in determining whether detention is appropriate, the probable length of pretrial detention faced by defendants. We limit our constitutional consideration to this point.

The Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (1983), not the preventive detention provisions of the Bail Reform Act, is the vehicle chosen by Congress to regulate the length of pretrial delays for both detained and undetained defendants. Congress' choice in this matter is clear from the legislative history of the Bail Reform Act. As the court stated in *United States v. Colombo,* 777 F.2d 96 (2nd Cir.1985),

> Reviewing the Act and its legislative history to determine whether there is any statutory foundation for ... consideration of anticipated length of detention, it appears that Congress was not unconcerned with this issue, but relied on the Speedy Trial Act ... to limit the period of pretrial incarceration. The Senate Judiciary Committee twice rejected a specific time period beyond which a defend-

ant could not be incarcerated pretrial, such as the 60 day limit present in the District of Columbia's pretrial detention statute. In assessing preventive detention proposals, the Committee rejected one such amendment and explained that:

> One element of the District of Columbia Code Provision not carried forward ... is its 60-day limitation on the detention period ... 18 U.S.C. § 3161 [of the Speedy Trial Act] specifically requires that priority be given to a case in which a defendant is detained, and also requires that his trial must, in any event, occur within 90 days, subject to certain periods of excludable delay.... These current limitations are sufficient to assure that a person is not detained pending trial for an extended period of time.

> *See* S.Rep. No. 225 at 22 n. 63, 1984 U.S.Code Cong. & Ad.News at 3205 n. 63.

*Colombo,* 777 F.2d at 100. The Senate Judiciary Committee also rejected, during its consideration of the Bail Reform Act, an amendment to the Speedy Trial Act that would decrease from 90 to 60 days the time period by which a pretrial detainee must be brought to trial, absent statutory exclusions of time.

As *Colombo* recognized, complex cases are occasionally not brought to trial until substantially after the 90 day time period set forth in the Speedy Trial Act. Indeed, Section 3161(h)(8)(B)(ii) specifically directs judges to consider, in determining whether to order or grant continuances, "whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation ... within the time limits established by this section." Thus, in multi-count, multi-defendant cases such as the case *sub judice,* delays excludable from Speedy Trial calculations under section 3161(h) are commonplace. We agree with the Second Circuit that in some such situations "the Speedy Trial Act might not 'work perfectly well to

protect against lengthy incarceration,'" and that the length of the "defendant's pretrial detention might not survive a proper due process challenge." *Colombo*, 777 F.2d at 101 (*quoting* 130 Cong.Rec. 938, 945 (Feb. 3, 1984) (Senator Grassley).

■ Nevertheless, Congress has provided a rational scheme for limiting the duration of federal pretrial detention and we decline to hold the Bail Reform Act unconstitutional for omitting the probable duration of pretrial incarceration from its enumeration of factors to be considered by the judicial officer in the initial detention determination. At the time of the detention hearing, the procedural form of the ultimate trial is still inchoate. Motions for severance may simplify a defendant's case, while motions for joinder may complicate it; similarly, motions to expedite a trial may shorten pretrial detention and unanticipated delays—including unnecessary ones attributable to defendant or the government—may lengthen it. Appellants demand for stronger due process protections for detainees awaiting distant trials is thus better met farther down the procedural road.

We agree with the Second Circuit that at some point due process may require a release from pretrial detention or, at a minimum, a fresh proceeding at which more is required of the government than is mandated by section 3142. Thus, a determination under the Bail Reform Act that detention is necessary is without prejudice to a defendant petitioning for release at a subsequent time on due process grounds. Because due process is a flexible concept, arbitrary lines should not be drawn regarding precisely when defendants adjudged to be flight risks or dangers to the community should be released pending trial. Instead, we believe that due process judgments should be made on the facts of individual cases, and should reflect the factors relevant in the initial detention decision, such as the seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or a danger to the community, and the strength of the government's case

on the merits. Moreover, these judgments should reflect such additional factors as the length of the detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has added needlessly to that complexity. In some cases, the evidence admitted at the initial detention hearing, evaluated against the background of the duration of pretrial incarceration and the causes of that duration, may no longer justify detention.

### IV.

Appellants further argue that Joseph Alonzo should have been produced for cross-examination. After some initial skirmishing, appellants identified Alonzo as the government's primary source of information concerning the alleged history and structure of the Accetturo organization and the extortion of Aron & Aron. Appellants, after challenging Alonzo's reliability, requested that he be produced for cross-examination. They proffered evidence tending to show that Alonzo had a lengthy criminal history, was a drug addict, and had a history of psychiatric disorders. Appellants contend that this case thus presents the issue left open in *United States v. Delker*, 757 F.2d 1390 (3d Cir. 1985), of whether a defendant "may have a right to confront non-appearing government witnesses when the defendant can make a specific proffer to the court of how the witness' testimony will negate the government's contention that defendant is a danger to the community." *Id.* at 1398 n. 4.

■ We are not prepared to find an abuse of discretion in the district court's decision not to compel the appearance of Alonzo. There was no reason to believe Alonzo would give evidence favorable to appellants or would retract information harmful to them. Appellants wished his presence only because they hoped visual observation of Alonzo would enhance their other evidence tending to show his unreliability. While the appellants' desire to have Alonzo present is understandable, the trial

judge was faced with the necessity of hearing a vast amount of evidence under exigent circumstances and his decision to deny appellants' request was well within the permissible range.

At the same time we note that, given the importance of this witness, the fact that appellants had tendered specific evidence tending to show unreliability, the prospect of appellants' lengthy detention, and the fact that Alonzo was both already known to appellants and in protective custody, this was the kind of situation in which a judicial officer should be sensitive to the fact that Congress' authorization of hearsay evidence does not represent a determination that such evidence is always appropriate. Nor does it relieve the judicial officer of his duty to require more when tendered hearsay evidence does not rise to the required level of reliability. As the First Circuit has pointed out in another context,

> the magistrate or judge possesses adequate power to reconcile the competing demands of speed and of reliability, by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question. Through sensible exercise of this power of selection, the judicial officer can make meaningful the defendant's right to cross-examine without unnecessarily transforming the bail hearing into a full-fledged trial or defendant's discovery expedition.

*United States v. Acevedo-Ramos*, 755 F.2d 203, 207–08 (1st Cir.1985).

### V.

Appellants also argue that the court erred in considering the government's wiretap surveillance evidence. Consideration of such evidence, they contend, is precluded by 18 U.S.C. section 2515, which provides that

> whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any

court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

The violation pointed to by appellants is of section 2518(9), which requires the subject of the wiretap be given ten days notice before a wiretap communication or evidence derived from such a communication may be used in any trial, hearing or other proceeding in a federal or state court. Section 2518(9) provides that

> this ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with [a copy of the court order, and accompanying application, under which the interception was authorized or approved] ... ten days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

■ Appellants argue that the plain language of section 2515 mandates its application to pretrial detention hearings. We need not reach this point. As the trial court found,

> [the government used] some electronic surveillance evidence at the hearings before Magistrate Haneke without any objection from the defendants.... The government did state its intention to continue to utilize electronic surveillance material in its initial brief in support of detention which defendants received in mid-September at least three weeks prior to these hearings. And the government's amended briefs rang similar bells.
>
> In the face of this, all three defendants waited until the eve of these hearings before me to raise this issue. Admittedly, the second time around the government utilized a greater amount of such material, but this was clearly predictable and foreseeable. Contrary to defendants' assertions, the notice provisions of Section 9 were not rendered meaningless with such advance notice.

(JA1251). In light of this clear notice to appellants and the fact that appellants' de-

lay in asserting their section 2515 rights effectively deprived the government of the ability to cure this defect in their notice, we hold that the appellants are estopped from asserting those rights.

## VI.

Appellant Accetturo further contends that in determining whether, under 18 U.S.C. section 3142(e), "there is probable cause to believe that" the defendant committed one of the offenses that triggers the rebuttable presumption that "no condition or combination of conditions will reasonably assure the safety of the community," the judge must rely on more than the bare indictment. We, again, need not decide whether an indictment is alone sufficient to trigger the rebuttable presumption, for although the district court found that it was, the court also stated, and we agree, that there was sufficient independent evidence as well to establish probable cause. (JA1292).

## VII.

Finally, appellants contend that at the hearing below they were denied the ability to present a meaningful defense. They argue that the court unduly limited the scope of their cross-examination of Marchalonis, permitted the government to offer *in camera* materials to which they could not adequately respond, and unfairly relied on evidence produced at one hearing in its decision to detain the other appellants.

We acknowledge the difficulty faced by defendants seeking to discredit government evidence when, as here, the government chooses to prosecute its case primarily through the use of hearsay. However, Congress has determined that the need for speed in reaching pretrial detention determinations justifies the use of procedures less demanding than those applicable to a "full-blown trial," *United States v. Delker,* 757 F.2d 1390, 1398 (3d Cir.1985). Moreover, in situations of this kind, there is an apparent, competing need to protect the identity of confidential informants and potential government witnesses. Neverthe-

less, the fact that the procedural protections afforded by the Bail Act are, of necessity, less than those required in a trial context is certainly no justification for sanctioning procedures that unnecessarily weaken the protections that are so afforded.

■ Appellants Accetturo, Taccetta and Ricciardi argue that the district court erred when it considered the Esposito and Aron & Aron *in camera* materials offered by the government. The government relies on *United States v. Stanford,* 551 F.Supp. 209 (D.Md.1982), which it contends was approved of for Bail Reform Act purposes in *United States v. Acevedo-Ramos,* 755 F.2d 203 (1st Cir.1985). In *Stanford,* the court admitted into evidence a sealed affidavit pertaining to threats to a prosecution witness. The court distinguished *United States v. Wind,* 527 F.2d 672 (6th Cir.1975), which had held that *in camera* testimony could not be relied upon during a bail hearing, because *Wind* involved an *in camera* evidentiary hearing rather than a single sealed document. The court concluded:

> where, as here, a defendant is provided with a summary of a sealed affidavit, the reliability of which is determined as a preliminary matter, and where the summary is found to be accurate and complete in terms of the type of detail necessary to put the defendant on notice as to the nature of the allegations against him, due process is not violated as long as the defendant has the opportunity to refute the allegations.

*Stanford,* 551 F.Supp. at 211.

We believe that reliance on *in camera* evidence is, as a general matter, inconsistent with the Bail Reform Act's procedural protections. While we have recognized that Congress authorized the government to proceed by hearsay, *United States v. Delker,* 757 F.2d 1390, 1397–98 (3d Cir. 1985), Congress did contemplate a hearing at which the defendant would be present with counsel and would have the opportunity to testify, present witnesses and cross-examine appearing ones. Inherent in this concept is the right to know what informa-

tion is being submitted to the decisionmaker and the opportunity to challenge the reliability of the government's sources as well as provide contrary information. An *in camera* presentation, even when a summary is provided to the defendant, seriously compromises these protections. While this court and others have on rare occasions sanctioned such presentations, this has been done only when there has been a most compelling need and no alternative means of meeting that need. This was not such a situation.

Precisely because the Bail Act permits hearsay testimony, the government will usually not need to present its case through *in camera* materials in order to protect potential witnesses. The point is well illustrated by this case. Time and time again Agent Marchalonis testified about information supplied him by persons he did not identify. While this manner of presentation obviously presented problems for the defense, as we have previously noted, it at least gave them the opportunity to direct questions regarding the reliability of the source to one familiar with the source. While the court permitted Marchalonis to refuse to answer questions that would tend to identify the source, the *in camera* approach foreclosed all such questioning. Most importantly, when the government proceeded in open court through Marchalonis' testimony, appellants and their counsel heard everything that the judge heard and were in a superior position to evaluate how best to counter it.[2]

Appellants Accetturo, Taccetta and Ricciardi further complain that the district court relied on evidence produced at other codefendants' hearings in ordering their detention. The government concedes that the district court considered seven items in the decision to detain Accetturo that were not produced at his hearing. These included:

(1) testimony concerning Taccetta-Perna extortions of bookmakers in the late 1970s;

(2) a tape transcript concerning Perna's loansharking operation, a seized loansharking book, and testimony concerning loanshark debtors' unwillingness to testify before the Grand Jury;

(3) a transcript of a conversation in which Perna and Ricciardi discussed killing a gambling operative (the "put into blackness" transcript);

(4) a transcript of a conversation in which Ricciardi and Perna advocated forcing a businessman to accept their video gambling machines;

(5) testimony that Michael Taccetta, Ricciardi, and Perna were seeking to identify the "rat" who testified against them;

(6) information from state/local law enforcement agencies confirming the June, 1984 Esposito beating and

(7) a statement by Michael Esposito's attorney that he is presently incarcerated on a contempt citation in a case related to the New Jersey Accetturo prosecution.

Government Response in Opposition to Accetturo Motion for Release, 39–40 (citations omitted).

Taccetta and Ricciardi complain that the district court's preliminary findings regarding the history of the organization, including their role in it, were used against them although never offered in evidence in their respective hearings. Ricciardi also points to information presented during appellant Perna's hearing, but not his, regarding loansharking activities and the fear of loansharking victims to testify, and to some of the information pertaining to the extortion of and threats to Esposito.

The United States argues that the items used against Accetturo were merely cumulative of information already presented to the court. The government further contends that no extra-hearing material was

---

**2.** In this case the government obviously believed it would be more effective to have the judge hear a tape of the intercepted conversations rather than to have an agent testify concerning them. Since letting the defendants hear the tape would risk disclosure of the participants, the government elected to make an *in camera* presentation. While this may have been effective from the government's point of view, we think it would seriously undermine the integrity of our criminal justice system to sanction this approach.

used against Taccetta, with the exception of the Aron & Aron materials, which it contends are admissible against Taccetta because he acquiesced in the admission of the deposition submitted by Accetturo. The government further contends that it produced evidence at Ricciardi's hearing to support each of the court's findings that he claims rested on overlapping evidence.

 As we have indicated above, although the Act permits the government to proceed by hearsay, it clearly contemplates that the defendant will have some opportunity to confront the evidence offered against him. A procedure by which a judge uses evidence offered only at someone else's hearing conflicts with this congressional intention in precisely the same ways as an *in camera* presentation. Accordingly, we hold such a procedure impermissible. We are also unpersuaded that the "overlapping evidence" was without prejudice to appellants or that the appellants waived their objection to its use.

Finally, we find that the district court was not unduly restrictive in limiting the scope of appellants' cross-examination of Marchalonis. The court upheld government objections to appellants' questions that, although going to the credibility of Marchalonis' confidential sources, would have helped to identify those sources. We have reviewed the record and, in light of the legitimate and established governmental interest in protecting government witnesses, we find no abuse of discretion.

## VIII.

Rather than independently assess the evidence validly offered against each appellant, we will remand these cases so that the trial judge can, if necessary, hold supplemental hearings and render individual decisions that do not rely on *in camera* evidence or evidence produced at other appellants' hearings. The trial court, having

heard and weighed the credibility of the testimony, may elect to investigate further matters on remand or choose to rely on the transcript below in reaching its new determinations. Appellants will remain detained until the district court has reached a fresh decision. Accordingly, should the court determine that additional hearings are appropriate, it should hold them promptly.[3]

We consequently remand these cases for further proceedings consistent with this opinion.

SLOVITER, Circuit Judge, dissenting in Part III.

I join in all portions of the majority opinion with the exception of Part III. I dissent as to that because I believe the court shirks its obligation to come to grips with the difficult issue presented by the extraordinary lengthy pretrial detention of these defendants, a detention that *at a minimum* will be six months. To decide, as the majority does, that a consideration of due process for pretrial detainees "awaiting *distant* trials" is "better met farther down the procedural road", majority op. at 388 (emphasis added), when these individuals have already been detained for more than three months, is to deny effective consideration of that issue at any time.

The Comprehensive Crime Control Act of 1984 effected a radical change in federal jurisprudence by authorizing pretrial detention in noncapital cases for criminal defendants who are found to threaten the safety of any other person or the community. 18 U.S.C. § 3142(e). In expanding the permissible ground of pretrial detention beyond that of guaranteeing that the defendant will appear at trial, Congress has shifted the focus from the bail provision of the Eighth Amendment to the Due Process provision of the Fifth Amendment. Defendants do not contend that the failure to afford them bail violates the excessive bail

---

3. Appellant Perna also contends that the government offered no evidence at his hearing pertaining to his post-1983 activities, thus failing to demonstrate, by clear and convincing evidence, that he is a *present* danger to the community.

Because we remand these cases to the court below for further proceedings at which "overlapping evidence" relating to a later period may validly be admitted against him, we need not reach this contention.

provision of the Eighth Amendment and thus we are spared consideration of the still unresolved question whether that amendment encompasses an affirmative right to bail as distinguished from merely governing the amount of bail for those situations where bail is applicable. *Compare* Foote, *The Coming Constitutional Crisis in Bail: Part I*, 113 U.Pa.L.Rev. 959 (1965) (right to bail) *with* Meyer, *Constitutionality of Pretrial Detention: Part I*, 60 Geo.L.J. 1139 (1982) (no right to bail).

Defendants, instead of making the blanket assertion that pretrial detention in noncapital cases violates their due process rights, reserve their constitutional attack for one aspect of the 1984 Bail Reform Act, its failure to assure that those defendants detained pursuant thereby are afforded a prompt trial. It is no answer to state, as the majority does, that Congress chose the Speedy Trial Act as the vehicle to regulate the length of pretrial delays. The issue before us is whether the scheme that led to the length of the pretrial detention defendants have already faced and will concededly continue to face is constitutional under whatever statute Congress chose as the vehicle.

The question, baldly stated, is whether a defendant accused of crime may be detained in a jail or prison for a virtually unlimited period of time without having been found guilty of the offense charged under the standard of proof applicable in criminal cases and on the basis of evidence which meets constitutional requirements for the criminal trial itself.

Conviction under the requisite standard of proof is one of the fundamental elements of due process. In *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), the Court stated, "we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Similarly, because of "the necessity for cross-examination as a protection for defendants in criminal cases," the right of confrontation

is a "fundamental right essential to a fair trial in a criminal prosecution" protected by due process as well as by the Sixth Amendment's Confrontation Clause. *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). Since a defendant cannot constitutionally be incarcerated for even one day as a result of a criminal trial that did not comport with at least these two fundaments of our criminal justice system (confrontation of witnesses and conviction under the reasonable doubt standard), one may well wonder about the unarticulated analysis by which the majority deflects the due process challenge by persons already incarcerated, euphemistically called "detained," for three months on the basis of only hearsay evidence, and sometimes double or triple hearsay.

The majority relies almost exclusively on the Second Circuit's opinion in *United States v. Colombo*, 777 F.2d 96 (2d Cir. 1985), where that court, also without any extended analysis of the legal basis for its decision, deferred consideration of the length-of-detention challenge by a defendant who had already been detained almost seven months. Regrettably, neither the majority nor the *Colombo* court articulated the precedential underpinnings for what has turned out to be lengthy pretrial detention. I believe that at least a brief review of those building blocks is necessary for an appreciation of the issue before us and for guidance in our decision.

In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Supreme Court held that the Fourth Amendment's protection against unreasonable search and seizure requires a timely judicial determination of probable cause as a prerequisite to detention, but also held that the full panoply of adversary safeguards, including confrontation, cross-examination, and the beyond a reasonable doubt standard, was not constitutionally compelled at this stage. The length of the pretrial detention was not an issue but the bases for detention in that case were the heretofore traditional ones of inability of one defendant to post the bail bond and the unavaila-

bility of bail to the other defendant because one of the charges carried a potential life sentence. *See id.* at 105, 95 S.Ct. at 858.

Thereafter, in *United States v. Edwards*, 430 A.2d 1321 (D.C.App.1981), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982), the District of Columbia Court of Appeals held that the preventive detention statute enacted for the District of Columbia, the prototype for the Bail Reform Act of 1984, did not violate due process. The District of Columbia statute, unlike the Bail Reform Act, provides a fixed time limit for pretrial detention. At the time of the *Edwards* decision, that Act provided for a maximum detention of sixty days (now increased in some cases to ninety days) unless the trial was in progress or had been delayed at the request of the detainee. There are no periods of excludable time in the District of Columbia scheme, and the *Edwards* court made particular reference to this time requirement in sustaining the statute. It stated:

> Significantly, pretrial detention is closely circumscribed so as not to go beyond the need to protect the safety of the community pending the detainee's trial. Such detention is not to exceed 60 days, by which time either the detainee must be brought to trial, or bail must be set.

430 A.2d at 1333.

Finally, pretrial detention was considered by the Supreme Court in *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), when it sustained the constitutionality of the New York Family Court Act authorizing pretrial detention of accused juvenile delinquents. Two factors in that decision bear note. First, the New York statute permitted "a brief pretrial detention based on a finding of a 'serious risk' that an arrested juvenile may commit a crime before his return date." *Id.* at 263, 104 S.Ct. at 2409. The time was indeed brief since the maximum possible detention was seventeen days, *id.* at 2413, and the Court specifically stated that "the detention is strictly limited in time." *Id.* Second, the Court distinguished the liberty interest of juveniles and adults, stating, "The juve-

nile's countervailing interest in freedom from institutional restraints, even for the brief time involved here, is undoubtedly substantial as well ... But that interest must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody." *Id.* at 2410 [citations omitted].

A respectable argument could be made that the absence of these two factors in the Bail Reform Act, i.e. the failure to specify a brief time for detention and its applicability to adults, so distinguishes it from the New York act upheld in *Schall* that a contrary result is warranted. Although we need not decide that issue as such, I agree with the majority's implicit prediction that it is unlikely the Supreme Court would so rule. The polestar of the reasoning of the *Schall* majority was that preventive detention "serves an important and legitimate function in the juvenile justice system." *Id.* at 2414. No lesser function can be seen in pretrial detention of adults, particularly those involved in drug transactions and organized crime, who have been found to threaten the safety of the community or persons therein.

Nonetheless the majority recognizes, as did the *Colombo* court from which it quotes, "that the length of the 'defendant's pretrial detention might not survive a proper due process challenge.'" Majority op. at 388 (quoting *Colombo*, 777 F.2d at 101). Of course, if we were confident that the Speedy Trial Act insured trial before that time, whenever it might be, there would be no basis to challenge the length of pretrial detention under the Bail Reform Act. However, the Speedy Trial Act was not designed to relieve the due process concerns implicated here. Instead, that Act was designed to effectuate the Speedy Trial provision of the Sixth Amendment. Its requirement of trial within 90 days for persons who have been detained, 18 U.S.C. § 3164, has turned out to be illusory, in large part because the provision covering detainees also incorporates the covering detainees also incorporates the periods of excludable time enumerated in section 3161(h) in computing the 90-day

time limitation. As a result, detention can continue while all of the 18 different circumstances enumerated in section 3161(h) give rise to excludable delay. In this case the district court on October 11, 1985, entered an order excluding from the Speedy Trial Act the period of time from September 13, 1985 until April 15, 1986, over the defendants' objections, predicated, in part, upon the complexity of the case and the large number of defendants (26 in all). *See* App. at 417–421.

This court, as others, has been liberal in construing the excludable delay provisions of the Speedy Trial Act when applying it to at-large defendants whose trial, under the Act, should begin within 70 days of the indictment or the first appearance before a judicial officer. *See, e.g., United States v. Novak*, 715 F.2d 810 (3d Cir.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984) (upholding convictions notwithstanding trial 228 days after indictment). The same construction of the excludable time provisions of section 3161 is inevitable even for detainees.

Thus, recent statistics show that 307 defendants were detained in custody 151 days and over prior to dismissal, plea of guilty or trial during the twelve month period ended June 30, 1985. Table D–13 of Appendix 1, Detailed Statistical Tables, Annual Report of the Director of the Administrative Office of the U.S. Courts. Although this represents only a small percentage of the total number of detained defendants, the substantial deprivation of liberty effected requires more than the passing acknowledgment accorded it by the majority.

The problem is accentuated by this court's decision in *United States v. Delker*, 757 F.2d 1390 (3d Cir.1985), which this panel is now bound to follow under our internal operating procedures. The due process concerns are caused by the interaction of two factors, the statutory failure to limit the time of detention and the casual procedures leading to detention approved in that case. Thus, despite the provision in the Bail Reform Act that the defendant "shall

be afforded an opportunity ... to cross-examine witnesses who appear at the hearing", 18 U.S.C. § 3142(f), which represents an obvious effort by Congress to preserve the defendant's right to confront the witnesses on whose testimony the detention order, if any, is to be based, the court stated in *Delker* that the district court could admit hearsay at the hearing. *Id.* at 1397. The statutory right to cross-examine is thus limited to the right to cross-examine those witnesses the government chooses to present, who at least in this case had no first-hand knowledge of the facts that were the basis of the testimony. Were the procedures leading to detention more scrupulous of defendants' fundamental rights, the likelihood of an erroneous decision would be decreased, and some of the concerns about length of detention would be alleviated.

Notwithstanding the above, I cannot disagree with the majority's holding that the Bail Reform Act is not facially unconstitutional because it does not contain a specific limitation on the amount of time that an accused may be detained prior to trial. The Supreme Court has eschewed a constitutional analysis that would impose precise time limits for trials to commence. *See Barker v. Wingo*, 407 U.S. 514, 529–30, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972). To measure due process in terms of days or weeks would jeopardize the essential flexibility of that term.

Consequently, we are faced with a dilemma. On one hand, we are unable to construe the Constitution as requiring a firm timetable limiting detention of persons who have not yet been accorded the due process rights to which criminal defendants are entitled. On the other hand, it is conceded by the majority, and supported by the available statistics, that at some point pretrial detention under the Bail Reform Act procedures will be unpalatable to our notions of fundamental fairness which underlie due process. Because the defendants whose liberties are most affected are those who are unlikely to command public sympathy or attention, it is unlikely there will be

action from Congress, which already has declined several opportunities to remedy the situation. Moreover, our inaction leaves the district courts without guidance.

Are we really without the means to remedy the abridgment of liberty of presumptively innocent persons? In various circumstances, this court has used its inherent supervisory power to establish rules that will effectuate the defendant's constitutional rights. *See, e.g., Government of the Virgin Islands v. Smith,* 615 F.2d 964 (3d Cir.1980) (court's inherent power to protect defendant's compulsory process rights by conferring immunity on an essential witness); *United States v. Moskow,* 588 F.2d 882 (3d Cir.1978) (supervisory power available to review conditional guilty plea); *United States v. Starks,* 515 F.2d 112 (3d Cir.1975) (supervisory power used to recommend that district courts conduct a voir dire of jurors whenever possibility of juror prejudice arises). *See also In re Grand Jury Proceedings (Schofield II),* 507 F.2d 963, 970 (3d Cir.) (Aldisert, J., dissenting) (supervisory power can be used to insure proper procedural safeguards as "a legitimate function of a court's law-making role"), *cert. denied,* 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975). *See generally* Schwartz, *The Exercise of Supervisory Power by the Third Circuit Court of Appeals,* 27 Vill.L.Rev. 506 (1982). As the Supreme Court stated, "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reasons which are summarized as 'due process of law' and below which we reach what is really trial by force." *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943).

If it is not for the appellate courts to establish rules that will vindicate a detainee's loss of his or her liberty interests during pretrial incarceration which will be irreparable if s/he is subsequently found innocent, then for whom? If it is not now

when we are faced with defendants who will spend a minimum of six months in jail before trial, then when?

I suggest that it is incumbent upon us to use our supervisory power to fix a timetable beyond which no person can be held in pretrial detention on the ground of dangerousness without being accorded a full due process hearing. The timetable should not be extended for reasons attributable to any factor other than that detainee's own waiver. Failure to comply would not result in dismissal of the charges, but merely in the defendant's release pending trial under appropriate conditions. The suggestion is hardly radical since it was the procedure in use for 200 years. I agree with Judge Weinstein that "a long period of preventive detention without a finding of guilt, based solely on possible danger to the public, is 'anathema to American ideals of due process.'" *United States v. Colombo,* 616 F.Supp. 780, 785 (S.D.N.Y.), (quoting R.B. McNamara, *Constitutional Limits on Criminal Procedure* 135 (1982)) *rev'd* 777 F.2d 96 (2d Cir.1985).

I respectfully dissent from the judgment of the majority because it has failed to accept the challenge, seize the opportunity, and take the bold step needed to insure effectuation of the defendants' due process rights.