**UNITED STATES of America,**

v.

**Louis GATTO, Sr., et al., Defendants.**

**Crim. A. No. 89–250(SSB).**

United States District Court,
D. New Jersey.

Dec. 22, 1989.

Office of the U.S. Atty. by James C. Patton, Asst. U.S. Atty., Newark, N.J., Miles R. Feinstein, Clifton, N.J., for defendant Louis Gatto, Sr.

William J. DeMarco, Wayne, N.J., for defendant Joseph Gatto.

Joseph T. Afflitto, Diamond, Afflitto & Raimondi, Wayne, N.J., for defendant Alan Grecco.

Peter V. Ryan, West Orange, N.J., for defendant Stefano Mazzola.

## OPINION

(Reconsideration of detention order of July 31, 1989 for defendant Alan Grecco.)

BROTMAN, District Judge.

Currently before the court is the motion of defendant Alan Grecco for reconsideration of this court's order of July 31, 1989 detaining defendant pending trial. For the reasons stated in this opinion, defendant's motion will be denied.

## I. FACTS AND PROCEDURE

On July 20, 1989, a federal grand jury sitting in the vicinage of Newark, New Jersey, returned a nine count indictment against Alan Grecco and seven other individuals, charging them with a RICO conspiracy and several other federal offenses. The Federal Bureau of Investigation executed arrest warrants on July 27, 1989. The arraignment was held before this court that same day, at which time the U.S. Attorney's office moved for pretrial detention of Alan Grecco under 18 U.S.C. §§ 3142(e), (f)(2)(B). The statute provides:

> (e) Detention—If, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, he [or she] shall order the detention of the person prior to trial....

> (f) The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) will reasonably assure the appearance of the person as required and the safety of any other person and the community in a case ...

> (2) Upon motion of the attorney for the government or upon the judicial officer's own motion, in a case that involves ...

> (B) a serious risk that the person will obstruct justice or threaten, injure, or intimidate or attempt to threaten, injure or intimidate, a prospective witness or juror.

*Id.*

A. *Detention Hearing held July 27, 1989.*

At the initial detention hearing, Mr. Grecco was represented for purposes of the detention hearing by Joseph Afflitto. The government elected to proceed by proffer.

In its proffer, the government offered a copy of the indictment. The indictment detailed events leading up to the takeover of the Belli gambling business. Arthur Belli's gambling business continued operating when, in 1976, he was jailed for several years. While Arthur Belli was in jail, Alan Grecco allegedly confronted Belli's brother, Robert, to get out of the gambling business. In August of 1976, witnesses identified Grecco as being at Robert Belli's friend's house, where Belli's car was parked. Later, two individuals wearing ski masks were seen circling Robert Belli's car, carrying baseball bats. Several days later,

two persons beat Robert Belli with baseball bats, causing him serious injuries. The government also maintained that Grecco later admitted that "he had to give Robert a beating." It was unclear from the government proffer to whom the statement was made.

According to the indictment, Arthur Belli disappeared several days after he was released from jail. Arthur Belli had told several people that he had to meet with "Little Al" and his father-in-law, Louis Gatto Sr., on the day of his disappearance. Arthur Belli's gambling business later shifted over to Alan Grecco. The government contended that Grecco solicited an individual to commit the homicide of Arthur Belli and he participated in two planning sessions with other defendants. The source of the government's information was not clear from its proffer.

The indictment set forth Grecco's participation in the takeover of a gambling business owned by Anthony Stumpo and James Barbarulla. Grecco allegedly threatened, directly and indirectly, to kill and do bodily harm to Stumpo and Barbarulla. The government offered that Grecco held a knife to Stumpo's throat to force him out of the gambling business. The government offered the indictment to support this allegation.

The indictment describes the extortionate collection of credit from Howard Clarke. The indictment alleges that Grecco threatened Clarke if he did not repay his gambling debts. Grecco allegedly confronted Clarke on his front lawn and slapped him. The government noted that the grand jury had heard evidence of a meeting between Grecco, defendant Stefano Mazzola, and others where additional threats of physical violence were made unless gambling debts were paid.

The indictment details the extortionate collection of credit from Anthony Stumpo. The indictment does not describe the means by which the debt was collected, but alleges that Grecco conspired and agreed to use extortionate means.

The government offered the Fulvi transcripts—a series of conversations between law enforcement agents and Anthony Fulvi. Fulvi was murdered in May 1980. The transcripts show that Grecco was heavily armed with machine guns, hand grenades, and bombs. The transcripts also implicate Grecco in the arson of the Fisherman's Net restaurant.

The government described the murder of Vinnie Mistretta, an individual that was suspected of speaking to police about the Gatto group. Mistretta was not a witness in any proceeding, but had spoken to police to help him retrieve his car from outside a social club operated by the defendants. The indictment states that Mistretta sought police assistance after a dispute with Grecco. Within several weeks, Mistretta was killed. A witness described the incident when Mistretta was killed with an ice pick. Mistretta allegedly said, just before his death, that Alan Wolshonak, a/k/a/ Alan Grecco, did it. Grecco allegedly had been seen in the area less than an hour before the murder, although this information is not part of the indictment.

The government offered evidence that Grecco was connected to two other homicides of persons suspected of giving information to police. Johnny Lombardi was a close associate of Grecco and the other defendants. He allegedly participated in several armed robberies and truck hijackings with Grecco. In fall of 1974, Lombardi was picked up by the FBI and became an informant. The government offered the Fulvi transcripts to support its allegation that Lombardi was murdered by Grecco.

The government described the murder of Peter Adamo. The government did not offer evidence to support its contention that Grecco was involved with this murder. Allegedly Adamo was suspected of being an informant. Earlier, when Adamo had accused another of being an informant, Grecco allegedly said, "I know the real story, and I'll take care of it." It is not clear from the government proffer to whom this statement was made.

The government offered a certificate of conviction for Grecco from 1982. Grecco had tried to bribe a state police officer in a criminal case where the defendant was the

son of a member of the Genovese organized crime family. The case involved a bar fight. Grecco was convicted of official misconduct and bribery.

Finally, the government offered evidence of the recent murder of Jack Ciaramella. Ciaramella allegedly had a falling out last year with the Grecco group, when he was the center of an Internal Revenue Service investigation concerning his business, Arid Basement Waterproofing, which was Grecco's employer. During the course of the investigation, it was revealed that Grecco was a no-show employee. Allegedly Grecco found out about a subpoena requiring Ciaramella to produce handwriting exemplars. Ciaramella was found murdered at the office. The office had a television camera so that he could buzz in people at the back door. The government suggested that Grecco committed the murder because Ciaramella would only buzz in persons whom he trusted. The indictment did not include this incident. The government did not offer any other evidence to support this contention that Grecco was involved or responsible for the murder.

At the initial hearing, the defendant offered a newspaper article dated April 17, 1989 from the Bergen County Record which stated that a grand jury was investigating the Genovese crime family. The defense noted that, despite this warning to defendants, the government was able to return indictments against them, implying that there was no risk of flight nor intimidation of witnesses or grand jurors. The defense also noted that the government's charges were supported by only unreliable sources and old information.

On July 31, 1989, this court entered an order of detention pending trial for defendant Alan Grecco, finding that there was a serious risk that the defendant would endanger the safety of another person or the community and that no set of bail conditions could reasonably assure the safety of the community at large or potential witnesses in this case. Defendant Grecco requested a *de novo* hearing to reconsider this detention order.

### B. *Detention Hearing held October 19, October 26, and November 9, 1989.*

In his brief, Grecco challenges the government's contention that he was involved in the crimes against Arthur Belli, Stumpo, Robert Belli, Mistretta, and Clarke. Defendant notes that the government did not identify the sources of the information, thereby failing to establish their credibility, their access to first hand information, the accuracy of their observations, and the absence of bias. The defendant also asserts that there is no reliable information to tie Grecco to the murder of Jack Ciaramella. Finally, defendant contends that the murder of Peter Adamo was thoroughly investigated, yet defendant was neither arrested nor prosecuted. The defendant notes that the Fulvi statements, which are inadmissible as hearsay at trial, cannot be challenged by cross-examination. In his brief supporting his motion for reconsideration, defendant offered over two dozen statements from friends and members of the community that indicate his good character and community ties.

 At the hearing held October 19, 1989, the court heard the testimony of FBI Special Agent David Cosgrove regarding the dangerousness of another defendant. At that hearing, Grecco sought documents from various state law enforcement agencies and one hospital by subpoenas returnable October 19, 1989. This court ordered *in camera* review of the documents to ascertain those documents to which defendants were entitled at the pretrial detention stage. *See* Opinion and Order dated November 22, 1989 729 F.Supp. 1478; Supplemental Opinion dated December 6, 1989. On October 26, 1989, counsel for Grecco chose to postpone the hearing for his client until all exculpatory documents were released by the court. This court rescheduled the hearing on defendant's motion for reconsideration until November 9, and again until November 27, until all documents were delivered to the court, reviewed, and the appropriate documents were released to defendants.[1]

---

**1.** This court notes that its *in camera* review of the subpoenaed documents does not violate the

## C. Detention Hearing held November 27–28, 1989.

In a hearing held before this court on November 27, 1989, the government's witness, Special Agent Cosgrove, was unavailable due to sudden illness. The court asked the government to outline the testimony that would have been presented, and the defendant waived his cross-examination of the witness. The government reiterated its proffer of July 27, 1989. The government stated that the source of its evidence with respect to the Lombardi murder and the Adamo murder was Frank Schneider, a long-time associate of Grecco's. The government offered that, prior to Lombardi's death, Grecco told Schneider to tell Lombardi to meet him. Schneider stated that he never saw Lombardi again. The government contended that Lombardi's family corroborated evidence that Lombardi was a close associate of Grecco's, that Lombardi hijacked trucks with Grecco, and that Lombardi became an FBI informant. The government noted that Grecco returned Lombardi's keys to his wife after Lombardi disappeared.

The government stated that Schneider also said that Adamo was suspected of talking with police, and was beaten by defendants. The beating, however, got "out of hand" and Adamo was killed.

The government maintained that Schneider also stated that Grecco asked him to commit the murder of Arthur Belli. He allegedly attended two meetings with defendants Louis Gatto Sr., Joseph Gatto, Louis Gatto, Stefano Mazzola, and Alan Grecco to plan the murder of Arthur Belli where Grecco "did all the talking." The government offered that Belli had stated that he had to meet with Grecco and his father-in-law, Louis Gatto Sr., on the day that he disappeared. The government did not identify to whom Belli made these statements. According to Schneider, Grecco conducted a two year campaign of terror to take over the Belli gambling business. The government offered that Grecco approached Belli's bookmakers during this campaign of terror. This information was corroborated by threats to Stumpo and Barbarulla when Grecco was trying to force them out of the gambling business.

With respect to the Mistretta murder, the government represented that Grecco was among those standing outside the social club when police accompanied Mistretta to pick up his car. The government stated that Grecco was staring and glaring in silence at Mistretta. The government contended that Mistretta's father, on behalf of Louis Gatto Sr. and Alan Grecco, later called Mistretta and warned him not to make trouble.

■ Frank Galimi, Mistretta's roommate at the time of his murder, allegedly recognized Grecco as one of Mistretta's assailants. The government noted that Galimi was terrified and wanted protection immediately after the murder. The government maintains that Galimi withdrew his cooperation when protection was not forthcoming. The government further offered that, al-

---

prohibition of reliance on *ex parte* submissions at a detention hearing. *See United States v. Accetturo*, 783 F.2d 382, 391 (3d Cir.1986). The *Accetturo* court reversed the trial court when it permitted the government to submit *in camera* materials for consideration, and to give the defendants summaries of those materials. *Id.* at 386. The trial court relied upon the materials in deciding to detain the defendants. *Id.*

In contrast, this court did not consider or rely on materials submitted under subpoena. As this opinion details, *ad nauseam*, this court has considered only those materials offered by the government through its briefs and papers, and evidence entered into the record at the detention hearings. Defendants had the opportunity to cross-examine the government's witness, and to use any *Brady* material contained within the

subpoenaed documents to contradict or challenge the government's information.

Under *United States v. Suppa*, 799 F.2d 115, 120 (3d Cir.1986), the defendants are not entitled to full scale discovery at the pretrial detention hearing. A prohibition on *in camera* review of materials subpoenaed by the defendants would circumvent the Third Circuit's mandate in *Suppa*, and provide defendants complete discovery. *In camera* review provides the only means to provide defendants with the materials to which they are entitled, which this court considers a most compelling need, while preventing full scale discovery at the pretrial hearing. *See United States v. Accetturo*, 783 F.2d 382, 391 (3d Cir.1986); *United States v. Gatto*, 729 F.Supp. 1478 (D.N.J.1989).

though police took Galimi to a hypnotist as part of their investigation, the government could prove that Galimi only pretended to be hypnotized and "faked out" the hypnotist. Presumably the government is concerned about the admissibility of Galimi's post-hypnotic statements as evidence.[2]

The government maintained that Special Agent Cosgrove's earlier testimony at the hearing corroborated evidence of Grecco's method of intimidation and violence in collecting debts.

Finally, the government maintained that fear of Grecco prompted two other defendants in this case not to cooperate with the government. The government contended that defendant Frank Camiscioli refused to cooperate with their investigation and stated "it would be signing his own death warrant." The government also approached defendant Peter Mylenki, who told government agents that he had to tell Grecco he had been approached but had refused to work with the government, for fear that Grecco would assume he had cooperated.

In his response, the defendant maintained that the government's evidence did not satisfy the clear and convincing burden required under the Bail Reform Act. The defendant noted that there was great doubt about the reliability and completeness of the government's information.

Defendant maintained that he is not a current danger to witnesses in this case because some of those witnesses, including Frank Schneider and Frank Galimi, are in protective custody. He noted that witnesses Anthony Stumpo and Robert Belli are communicating and cooperating with defendants' investigator.

Defendant attacked the credibility of Galimi as a witness in the Mistretta murder. Defendant proffered that Joseph DeVittelone stated that Mistretta had been acting strangely and was paranoid. Defendant maintained that this testimony refuted the government's allegation that Mistretta was upset with Grecco. Defendant also noted

that, although the victim was covered with blood, police found no blood on Grecco's clothing when he was arrested later that night. Although the police executed search warrants of Grecco's home and car, laboratory reports showed nothing to implicate Grecco in the murder.

Defendant also offered police reports to show that Galimi had made inconsistent statements to police regarding whom he saw running away from the murder scene. In exhibit DG–12 (also numbered G–70), Galimi stated that he did not recognize Grecco as one of the two men fleeing the scene. In exhibit DG–13 (also numbered G–28), Galimi stated under hypnosis that he believed that one of the men fleeing the scene was Al Wolshonak, a/k/a Alan Grecco. Defendant notes that he was never charged with involvement with the murder, except in the instant indictment.

Counsel for defendant offered Grecco's affidavit for the limited purpose of consideration at the detention hearing. (DG–15). In the affidavit, Grecco denies any involvement with the disappearance of Arthur Belli, the murder of Vincent Mistretta, the murder of John Lombardi, the murder of Peter Adamo, the murder of Jack Ciaramella, or threats to Anthony Stumpo, James Barbarulla, Howard Clarke, or Robert Belli.

With respect to the beating of Robert Belli, the defendant offered Belli's statement that he did not know who had beaten him. Belli's then-girlfriend, Francine Dave, stated just after the beating that Robert Belli owed money and might be in some kind of trouble. She also stated that Robert Belli might have been in trouble with Trobiano over some stolen tools and that Trobiano had threatened Robert Belli. Defendant maintained that he and Robert Belli were, in fact, good friends who recently played golf together. Defendant asserted that Robert Belli stated that he has no current concern about his safety.

---

**2.** This court notes that it may nonetheless consider such evidence at this pretrial detention hearing under the Bail Reform Act, 18 U.S.C. § 3142(f) (rules of admissibility at trial do not apply to presentation and consideration of evidence at hearing).

Defendant also maintained that prospective government witness Anthony Stumpo has no current concern about his safety. Stumpo apparently has consulted with Grecco's attorney and investigator since the indictment came down. Defendant maintains that Stumpo resisted testifying before the grand jury and resisted entering protective custody when the government released discovery materials to defendants, presumably because he is not afraid of defendants.

Defendant also noted that, although the government has extensive taped evidence of conversations made while Stumpo was wearing a wire, the tapes do not disclose a single threat made by defendant. The government also failed to tape the specific incident where Stumpo was allegedly threatened by Grecco to pay gambling debts, which would corroborate Stumpo's testimony about such threats.

With respect to the Lombardi murder, the defendant noted that the statements of Schneider and the Fulvi transcripts contradict. Schneider maintains that Lombardi's body is buried in Pennsylvania, while Fulvi stated that Grecco threw the body into a vat of acid. Defendant also maintained that it was not unusual that Grecco would return Lombardi's keys to his wife because Lombardi often disappeared for several days at a time. She would often stop by one of the social clubs to inquire about his whereabouts, and had received money from Grecco to carry her and her family until Lombardi reappeared.

To contradict the government's evidence in the Adamo murder, defendant stated that Adamo had many problems; he owed money, he had been in fights, and he had many enemies. During the investigation of the murder, Grecco was specific about his whereabouts in his statements to police. Grecco was testified before a grand jury and was cross examined under oath regarding the incident, however, no bill was returned. Defendant presented a report that corroborated his alibi for the night of the Adamo murder. The defendant noted that police found no scientific connection between splinters found on the victim and chairs in the social club where the government maintains Adamo was murdered. The defendant also pointed out that the statements of Frank Schneider were unclear as to which social club was the site of the murder.

Defendant also offered statements by codefendant Camiscioli's attorney that his client denies stating that his cooperating with police would be like signing his own death warrant. Additionally, defendants offered that codefendant Mylenki disputes the portion of Special Agent Cosgrove's report that discusses Mylenki's statement that he had to tell Grecco that he had been approached by the FBI for fear that Grecco would assume he had cooperated with the government.

Defendant also attacked the credibility of Frank Schneider's testimony because Schneider is a drug user who has "spent half his life in prison." Schneider currently has federal charges pending against him. Defendant notes that Schneider was not threatened or intimidated even though defendants knew he had charges pending and presumably might cooperate with the government. Defendant also notes that there is no surveillance or tape evidence to corroborate what Schneider has said.

Defendant offered the sworn statement of Debbie Grecco, the defendant's wife, that her husband was at home at a birthday party on the night that Ciaramella was murdered. (DG–20). Defendant offered the affidavit of Angelo and Theresa Grecco, pledging land and a building worth $375,000.00 to secure his bail. (DG–21) Defendant offered the affidavit of Roslyn and James Marchese, who offered their residence worth $150,000.00 less a $17,000.00 mortgage to secure Grecco's release. (DG–22). Defendant offered the affidavit of Michael Dishuk, David Dishuk, and Gary R. Dishuk pledging property worth $550,-000.00 less mortgages of $85,000.00 and $190,000.00 (DG–23), and the affidavits of Karen and Jerome Porta pledging property worth $190,000.00 with a mortgage of $109,000.00 (DG–24). Louis Gatto Jr., Joan Gatto, and Karen Porta submitted an affidavit pledging property worth $275,000.00

less a mortgage of $61,000.00 to secure Grecco's release. (DG–25). Defendant acknowledged that these properties were pledged to secure the release of Louis Gatto Sr., but noted that the bondsman was willing to accept the overlapping security for the release of Grecco.

Finally, defendant Grecco proffered that during the investigation of the Mistretta murder, police received information that Mistretta had been "passing out bullets with people's names on them." Also, the defendant proffered that Mistretta had been arrested carrying a loaded gun by Secaucus police.

In rebuttal, the government highlighted the refusal of codefendants Mylenki and Camiscioli to cooperate with the government's investigation. The government maintains that the fact that these two opted to become codefendants in a major racketeering case rather than testify against Grecco is indicative of the fear and terror that Grecco inspires. The government noted that Stumpo's reporting to the defense attorneys reveals his fear of the defendants, not his absence of fear. His fear is further shown by his being "the first to call" the defense attorneys after each detention hearing to ascertain whether defendants had been released.

The government also contended that Grecco's power and ruthlessness is demonstrated by Robert Belli's and Peter Leone's reporting to Grecco that investigators were again asking about Arthur Belli's disappearance. The government maintained that Grecco's ability to instill fear is shown in that these witnesses felt compelled to report to Grecco even though they, being closest to the victim, had the least motive to falsely accuse someone of the murder.

The government acknowledged that Leone, a long-time gambling associate and friend of Arthur Belli, told Grecco and attorney Miles Feinstein that he told investigators that Arthur Belli did not tell him that Belli planned to meet with Grecco and Louis Gatto Sr. on the day he disappeared. The government maintains, however, that Leone told investigators that he had been a bookmaker for Arthur Belli, had been approached by Grecco while Arthur Belli was in jail, and that Leone left the gambling business shortly thereafter. Leone also "literally trembled" when questioned about Grecco by investigators.

The government also maintains that Robert Belli is polite to defendants, not because he is unafraid of defendants, but because he fears for his life. Robert Belli allegedly was terrified by Grecco's visit to inquire about the investigation, and called investigators immediately after Grecco left. On other occasions when Robert Belli spoke to Grecco, he wore a hidden recording device and was under surveillance.

The court now considers whether the government has shown by clear and convincing evidence that there is a serious risk that defendant Alan Grecco will endanger the safety of another person in the community and that no set of bail conditions could reasonably assure the safety of the community or potential witnesses in this case.

## II. DISCUSSION

The governing statute is the Bail Reform Act, 18 U.S.C.A. §§ 3141–3156 (1985 & Supp.1989). The statute's enactment reflects the deep public concern about the growing problem of crimes committed by persons on release and the recognition that "there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." *United States v. Accetturo*, 783 F.2d 382, 384 (3d Cir.1986) (quoting S.Rep. No. 225, 98th Cong., 1st Sess. 6–7, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3188–89).

The act authorizes a judicial officer, after a hearing, to order detention if he or she "finds that no condition or combination of conditions will reasonably assure the appearance of the [defendant] ... as required and the safety of any other person and the community." 18 U.S.C.A. § 3142(e). At the detention hearing, the defendant has the right to counsel, and "shall be afforded an opportunity to testify, to present wit-

nesses on his own behalf, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise." *Id.* § 3142(f). The act also provides that "the rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." *Id.* The judicial officer may detain a defendant only if his or her finding that no condition or combination of conditions will reasonably assure the safety of any other person and the community is supported by clear and convincing evidence. *Id.*

The Court of Appeals for the Third Circuit has recognized that "at some point due process may require a release from pretrial detention...." *United States v. Accetturo,* 783 F.2d 382, 388 (3d Cir.1986). The court must consider the "seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or a danger to the community, and the strength of the government's case on the merits," as well as the "length of detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has needlessly added to the complexity." *Id.* The length of the detention is critical due to the "crucial liberty interest at stake." *United States v. Suppa,* 799 F.2d 115, 120 (3d Cir.1986).

First, this court turns its attention to whether this court may detain defendant Grecco because no condition or combination of conditions will reasonably assure the safety of any other person or the community. The court must consider the available information concerning:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). The court notes that its analysis of § 3142(g)(1) and § 3142(g)(4) are intertwined because the indictment lists several incidents from the past that are probative of Grecco's danger to the community.

### A. *The Indictment.*

In considering the nature and circumstances of the offense charged under § 3142(g)(1), this court finds that, although the crime of racketeering does not necessarily involve violence, the offenses described in the indictment to show a "pattern of racketeering activity" are violent crimes, and are therefore probative of defendant Grecco's dangerousness to the community. The current offense includes violent acts such as extortion, threats, and murder as predicate acts.

The government initially relied on the indictment to show the dangerousness of Grecco from the beating of Robert Belli and the disappearance of Arthur Belli. The indictment alleges Grecco threatened Barbarulla to quit the gambling business. The government offered the indictment to show that Grecco held a knife to Stumpo's throat, and that Grecco threatened Clarke, and slapped him, to collect gambling debts. According to the indictment, Grecco threatened Stumpo to collect debts as well. The indictment also alleges that Grecco conspired to murder Vincent Mistretta, and in fact did murder him with an ice pick. However, the indictment merely establishes probable cause; the government's burden to show dangerousness here is clear and convincing evidence. Thus, the govern-

ment must go beyond the face of the indictment to satisfy its burden.

Outside the indictment, the government offered evidence that Grecco was connected to two other homicides. In the Lombardi homicide, the government offered the Fulvi transcripts as support for its contention that Grecco was involved. The Fulvi transcripts show that Grecco was heavily armed and implicate Grecco in an arson. In the Adamo murder, however, the government did not identify its source. The government's evidence regarding the murder of Ciaramella was not in the indictment or the Fulvi transcripts. The government also offered the certificate of conviction for bribery of a witness.

### B. *Statements of Frank Schneider.*

To bolster its proffer, the government offered statements of Frank Schneider. Schneider had maintained that Grecco asked him to murder Arthur Belli, and that he attended two meetings where Grecco helped to plan the murder. Schneider also contended that Grecco threatened and terrorized members of the Belli gambling business. This information was corroborated by the testimony of Stumpo and Barbarulla, who allege they were also intimidated into leaving the gambling business by Grecco's threats of physical harm. The information was further corroborated by Peter Leone, who told government agents that Grecco approached him while he was a bookmaker for Arthur Belli.

Schneider also alleged that, just prior to Lombardi's death, Grecco told Schneider to tell Lombardi to meet him. Schneider maintained that Lombardi had participated in truck hijackings with Grecco and was suspected by Grecco of talking to law enforcement agents. Lombardi's family corroborated evidence that Lombardi was a close associate of Grecco's, had hijacked trucks with Grecco, and had become an FBI informant.

Schneider also stated that Adamo was murdered at a social club frequented by Grecco as the result of a beating that "got out of hand." Defendants allegedly suspected Adamo of talking with police. It is unclear from the evidence presented by the government who suspected Adamo, who beat Adamo, and who was present when Adamo was beaten. The government wishes the court to draw the inference that Grecco was somehow responsible. The court refuses to do so on the generalities presented.

Defendant Grecco has attacked Schneider's credibility by proffering evidence that he is a chronic drug user who has been in and out of prison. Schneider currently has charges pending against him, thus his testimony may be biased as he may attempt to gain favor with the government. Defendant also noted that, with respect to the Adamo murder, Schneider gave the wrong street address. Defendant suggested that this error showed that Schneider did not even know which social club he meant. The court, however, finds that Schneider was simply incorrect about the street address of the club. His testimony is not void of credibility as a result of this error.

Schneider's statement that Lombardi was buried somewhere in Pennsylvania was contradicted by the Fulvi transcripts, in which Anthony Fulvi told investigators that Lombardi was thrown into a vat of acid by Grecco and other defendants. This discrepancy does not render Schneider's testimony about Grecco's involvement in hijackings incredible. Additionally, Grecco's participation in Lombardi's murder is not refuted simply because Schneider could be wrong about disposal of Lombardi's body.

Although Schneider did not directly implicate Grecco in the Adamo murder, defendant seeks to eliminate the inference that Grecco was involved by offering the following evidence: Grecco's alibi is corroborated with a report; Grecco was specific about his whereabouts in his statement to police; Grecco testified before a grand jury and was cross-examined about the incident without being indicted for any crime; police laboratory reports did not show any connection between the physical evidence found on the victim and the social club that Schneider alleges was the scene of the murder. Defendant also proffered that

Adamo had many problems at the time of his murder; he owed money, he had been in fights, and he had many enemies.

The court notes that cross-examination of Special Agent Cosgrove revealed that Schneider had previously lied to law enforcement agents to receive favorable treatment. Transcript of hearing held Oct.. 19, 1989, at 118. According to Cosgrove, Schneider devised a fraudulent scheme to get out from under a sentence. *Id.* at 121–22. Cosgrove revealed that his discussions with Schneider about events in 1977 did not take place until 1988, eleven years after the events occurred. *Id.* at 126. Cosgrove revealed that Schneider's rap sheet was approximately six pages long. *Id.* at 116. Cosgrove stated that Schneider's sentencing in a New Jersey drug charge is still pending, and is not scheduled until April, presumably after Schneider testifies in this trial. *Id.* at 120–21.

The court finds that, on the evidence presented, the government has failed to show that Grecco was responsible for the Adamo murder. The court still finds that Schneider's testimony with respect to the Belli disappearance, the takeover of the Belli gambling business through threats and intimidation, and the Lombardi murder is not void of credibility. The testimony bolsters the government's proffer based on the indictment.

Defendant also argues that he is no threat to Schneider because Schneider is in protective custody, however, this argument misses the point. This court may consider defendant's past conduct in determining whether bail conditions can assure the safety of witnesses or the community. That one witness is in protective custody does not ameliorate the danger that other witnesses will be intimidated.

### C. *Statements of Anthony Stumpo.*

The government also offered the statements of Anthony Stumpo to bolster its proffer that Grecco threatened Stumpo to get out of the gambling business and to collect a gambling debt. The defendant maintained that Stumpo has no fear of Grecco as shown by his repeated contact with Grecco's attorney throughout these proceedings. Defendant also maintained that Stumpo's lack of fear is demonstrated by his reluctance to appear before the grand jury in this case, and his resistance to entering protective custody when discovery in this case was released.

Defendant also noted that, despite hours and hours of taped conversations, the government was unable to provide a single tape in which Grecco threatened a potential witness. The government did not provide a tape to corroborate Stumpo's testimony that he was threatened by Grecco to pay a gambling debt or threatened at knifepoint to quit the gambling business.

This court finds that Stumpo's attentiveness to the detention proceedings and his reluctance to appear before the grand jury are probative of his fear of the defendants, including Grecco, not of his lack of fear. Stumpo's cordial behavior can be explained as his trying to remain in favor with those he considers too dangerous to cross. Additionally, the absence of a tape of Grecco threatening Stumpo does not prove that Grecco never threatened Stumpo. The government has not represented that all transactions between Stumpo and defendants were taped, and this court will not presume that Stumpo taped all conversations. Thus, this court finds no reason to disbelieve Stumpo's testimony.

### D. *The Anthony Fulvi Transcripts.*

The government offered the Fulvi transcripts to bolster its proffer. The transcripts indicate that Grecco and others feared that Lombardi would cooperate with law enforcement authorities. Grecco allegedly participated in Lombardi's murder and, with others, threw his body in a vat of acid. The transcripts also state that Grecco participated in the arson of the Fisherman's Net restaurant and in truck hijackings.

Defendant attacked the Fulvi transcripts because they contradicted Schneider's statement about the disposal of Lombardi's body after his death. The court notes that the statements were made by a convicted felon. The court finds that these factors

do not entirely discredit the Fulvi transcripts.

### E. Statements of Frank Galimi.

The government also offered the statements of Frank Galimi to bolster its proffer. Galimi corroborated the indictment with respect to the Mistretta murder. Galimi told police that the victim said that Grecco had killed him. Galimi later told police that he saw Grecco flee the murder scene. Defendant points out that, in another report to police, Galimi stated that he knew Grecco, and that Grecco was not one of the two persons fleeing the scene. However, the government explained that Galimi recanted his story when he discovered that the police would not provide protection for him.

Defendant also attacked Galimi's credibility, proffering that Galimi was a paranoid and explosive personality who had been under psychiatric treatment. Galimi had a criminal record, and had used drugs and alcohol. Galimi once attempted suicide by consuming tranquilizers and alcohol. Defendant sought to discredit Galimi's version by pointing out that, although Galimi stated that the victim was covered with blood, police found no blood on Grecco's clothing or in executing search warrants on Grecco's house and car.

█ This court finds that Galimi's paranoia and psychiatric treatment does not necessarily make his testimony unbelievable. Additionally, it is plausible that a witness would recant his story to police when no protection was forthcoming if that story implicated someone he feared. Thus, this court finds Galimi's statements implicating Grecco in the murder of Mistretta to be probative of Grecco's dangerousness.

### F. Statements of Robert Belli and Francine Dave.

The government did not offer evidence to bolster its proffer on the beating of Robert Belli. Defendant proffered Belli's statement that he did not know who beat him. Defendant also presented Belli's girlfriend's statement that Belli might have been in trouble with others, and that others had threatened Belli. Defendant noted that he is a friend of Belli's, and that Belli has stated he has no current concern about his safety.

As stated *supra*, this court dismisses the notion that maintaining friendly relations with Grecco is probative of the witness's lack of fear. Additionally, while Belli's and his girlfriend's statements offer alternative inferences that may be drawn from the facts, the statements do not contradict the government's version. The court finds that they do not discredit the government's proffer that Grecco participated in the beating.

### G. Testimony of Special Agent David Cosgrove.

The government proffered that Cosgrove, had he been available at the hearing held November 27–28, would have testified that two codefendants in this case refused to cooperate with the government out of fear of defendant Grecco. Defendant maintains that codefendant Camiscioli denies telling Cosgrove that cooperating would be "like signing [his] own death warrant." Defendant also maintains that codefendant Mylenki disputes that portion of Cosgrove's report that includes Mylenki's statement that Mylenki "had to tell Grecco" that he had been approached by the FBI for fear that Grecco would assume he had cooperated. The court finds that these inconsistencies do not necessarily discredit the government's proffer. As discussed *supra*, these codefendants may be frightened into recanting their statements.

### H. Other Incidents Proffered by the Government.

In its initial proffer to this court, the government suggested that Grecco was somehow responsible for the murder of Ciaramella, however, the government did not offer any information to support its contention. At the hearing held November 28, 1989, the government represented that it was not withdrawing its proffer, however, the government did not offer any evidence to support the proffer at that time. Grecco presented the affidavit of

Debbie Grecco stating that the defendant was at home at the time of this murder.

Because the incident is not part of the indictment, nor did any witness corroborate the government's vague proffer, this court refuses to consider the government's speculative contention that Grecco was somehow involved in the murder. The government's contention that Grecco must have committed the murder because Ciaramella would only buzz in persons that he knew is absurd.

The court notes that the government also did not offer evidence to support its proffer that Grecco threatened Clarke for repayment of a gambling debt. The defendant, however, has offered nothing to discredit the government's proffer, thus the court shall consider this threat as probative of Grecco's dangerousness.

The indictment implicated Grecco in the murder of Adamo. According to Schneider, Adamo was murdered at a social club frequented by Grecco as the result of a beating that "got out of hand." The government proffered that Grecco suspected that Adamo had been talking with police. It is unclear from Schneider's testimony who suspected Adamo, who beat Adamo, and who was present when Adamo was beaten. The government wishes the court to find that this testimony corroborates the allegations in the indictment that Grecco participated in the murder. The court refuses to find that the generalities presented bolster or corroborate the government's allegations in the indictment. Additionally, defendant's affidavit denies any participation.

■ This court finds that the evidence that no condition or combination of conditions will reasonably assure the safety of the witnesses and the community is clear, convincing, and overwhelming. Grecco has been implicated in many violent crimes, including hijacking, robbery, arson, beatings, extortionate threats to Stumpo and Clarke, and the murders of Arthur Belli, Johnny Lombardi, and Vincent Mistretta. The evidence shows that Grecco has used threats and intimidation to take over the Belli gambling business. The evidence also shows that Grecco, in the past, has been heavily armed with machine guns, hand grenades, and bombs. The court notes that defendant was not, at the time of the indictment, on parole or probation. His prior criminal record, although not extensive, shows Grecco's willingness to approach trial witnesses, as demonstrated by his conviction of bribery of a witness. While the court has considered the defendant's proffer of letters from the community, the probative value of these offerings pales when compared to the evidence of defendant's willingness to use violence to obtain his desired ends. Grecco's use of violence against persons whom he suspects of betraying him to law enforcement authorities includes the murders of Mistretta and Lombardi. His ability to intimidate witnesses is demonstrated by the refusal of a codefendant to cooperate with the government's investigation of this case because it would be "like signing [his] own death warrant" and another codefendant's telling Grecco about inquiries from the government to be sure Grecco did not assume he was cooperating. Therefore, the nature and seriousness of the danger to potential witnesses in the case is substantial given defendant's past use of threats and intimidation, and his being implicated in violent crimes such as hijacking, robbery, arson, and murder. The court finds that detention of this defendant pending trial is warranted under § 3142(e) because no set of bail conditions could reasonably assure the safety of the community at large or potential witnesses in this case.

Next, the court must consider whether, at this point, due process requires release from pretrial detention under *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir.1986); *United States v. Vastola*, 652 F.Supp. 1446, 1449 (D.N.J.1987). The Court of Appeals for the Third Circuit has recognized that "at some point due process may require a release from pretrial detention...." *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir.1986). The court must consider the "seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight

or a danger to the community, and the strength of the government's case on the merits," as well as the "length of detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has needlessly added to the complexity." *Id.* The length of the detention is critical due to the "crucial liberty interest at stake." *United States v. Suppa,* 799 F.2d 115, 120 (3d Cir.1986). *See also United States v. Perry,* 788 F.2d 100, 114 (3d Cir.), *cert. denied,* 479 U.S. 864, 107 S.Ct. 218, 93 L.Ed.2d 146 (1986) ("the grave invasion of the most fundamental of all personal liberties that occurs when preventive detention is ordered").

This court notes initially that the charges in the indictment are serious and reflect several predicate acts of violence. The offense charged here does not raise the statutory presumption of § 3142(e) that presumes that no condition or combination of conditions will reasonably assure the safety of the community. Rather, the government produced evidence at the hearings to demonstrate clearly and convincingly that defendant is dangerous. These factors weigh against Grecco's release at this time.

The length of detention here is significant. The defendant has already been detained for almost five months. At the hearing held October 19, 1989, the United States Attorney represented to the court that the government would be prepared to try the case within one month of receiving defendant's pretrial motions and that the trial of the case would take three months or less. The court set a date of January 19, 1989 for filing of defendant's pretrial motions. Thus, the earliest date for trial will be February 19, 1989. If the trial lasts the anticipated three months, defendant will be detained for ten months.

In *Vastola,* defendants were detained under the statutory presumption of dangerousness. 652 F.Supp. at 1447. This court released defendants under stringent conditions when it appeared that defendants would have been detained eighteen months. *Id.* at 1449. *Vastola* is clearly distinguishable. There, the government had not shown defendants to be dangerous, but rather relied on the statutory presumption. Here, the government has shown by clear and convincing evidence that defendant is dangerous. Additionally, defendant is not yet facing eighteen months of detention. The balance does not tip in favor of release here.

This case is complex. The government represented that there are tapes from over 200 days of court-ordered listening devices, and that the government prepared logs to serve as an index for the tapes. By contrast, in *Vastola,* the government presented 3000 to 3800 hours of tape evidence, but did not provide an index of the contents of the tapes. The government also delayed giving the tapes to defendants' counsel. The *Vastola* case involved twenty-one defendants on 117 counts under several statutes for illegal activities in both New Jersey and Maryland. Defendants in *Vastola,* therefore, required "an unusually amount of time for preparation." *Id.* at 1448. This court finds that the circumstances compelling release of the *Vastola* defendants pending trial are not present here. The case is not as complex nor will it require the extended preparation that *Vastola* required. The government has not "needlessly added to the complexity" of the case. *Accetturo,* 783 F.2d at 382.

 The court finds that the length of detention and complexity of the case do not outweigh the danger to the community if this defendant were released. This court will reconsider the matter *sua sponte* if detention is prolonged beyond the current schedule.

### III. CONCLUSION

This court finds that the government has shown by clear and convincing evidence that no condition or combination of conditions can reasonably assure the safety of the community at large or potential witnesses in this case. For that reason, defendant Grecco's motion for reconsideration of this court's order of detention pending trial of July 31, 1989 will be denied.

An appropriate order will be entered.