UNITED STATES of America

v.

James GIAMPA, Defendant.

Crim. No. 90–165.

United States District Court,
W.D. Pennsylvania.

Dec. 5, 1990.

Gregory Nescott, Asst. U.S. Atty., for plaintiff.

Thomas R. Ceraso, Greensburg, Pa., for defendant.

## MEMORANDUM ORDER

### D. BROOKS SMITH, District Judge.

*Findings of Fact*

1. On August 15, 1990, a government informant telephoned the defendant, James Giampa, and told him that he had four bicycles, and that if Giampa were interested, he would provide Giampa with one. (Testimony of Agent Rotter, Tr. 6) [1]

2. This telephone call was monitored by DEA Special Agent Joseph Rotter. (*Id.*)

3. According to Agent Rotter, the government informant indicated that the term "bicycle" was his codeword for cocaine. (*Id.*)

4. During the conversation, the defendant and the informant made arrangements to meet in a hotel lobby in Pittsburgh. (*Id.*)

5. Giampa arrived at the hotel at approximately 1:15 p.m. on August 16, 1990 and telephoned the informant's room. (Tr. 6–7).

6. The two men met in the lobby and then proceeded to the informant's room. (Tr. 8)

7. The hotel room was equipped with electronic surveillance equipment. DEA agents monitored the conversation between defendant and the informant. (*Id.*)

8. The informant offered to sell Giampa one kilogram of cocaine for $27,000.00 dollars. (Tr. 9).

9. Giampa indicated that he did not have the money at the moment. The informant then stated: "I'm going to give you this, but I don't know if I should do this." Giampa responded: "Look, you have known me for a while. I can get you the money in two weeks." The informant agreed to this arrangement and after a brief discussion, Giampa left the hotel room with one kilo of cocaine. (Tr. 8–9)

10. Several DEA agents, along with local police, stopped Giampa in the hall and placed him under arrest. Giampa laid face down on the ground as the DEA agents placed him in handcuffs. At that time, one of the officers' guns was drawn. (Testimony of Agents Rotter and Schmotzer)

11. DEA agent Frank Schmotzer then advised Giampa of his *Miranda* rights.[2] He read Giampa his rights from a DEA-issued "rights card" and asked Giampa if he understood his rights. Schmotzer also informed Giampa of the charges which would be brought against him.

12. Schmotzer then asked Giampa if he was willing to cooperate. Schmotzer explained that Giampa did not have to cooperate and made no promises or threats contingent upon Giampa's cooperation. (*Id.*)

13. Giampa indicated that he was willing to cooperate and Schmotzer brought Giampa to case agent Joseph Rotter. (*Id.*)

14. Rotter did not repeat the *Miranda* warnings but did ask Giampa if he understood his rights, and Giampa indicated that he did. (Testimony of Agent Rotter)

15. Giampa told Rotter that he had received the cocaine from the individual in the hotel room and that he planned to sell the cocaine and pay his supplier in two (2) weeks. (Tr. 10)

16. At the time of his arrest and statement to the DEA, Giampa did not appear to be under the influence of alcohol or drugs. (Testimony of Agents Rotter and Schmotzer)

17. The DEA agents then proceeded to transport Giampa to the DEA office in Pittsburgh. During the ride, Giampa indicated that he wanted an attorney. (*Id.*)

---

1. "Tr." refers to the 44 page transcript of preliminary examination and detention hearing held before Magistrate Judge Robert C. Mitchell on August 17, 1990. This transcript was made part of the record before this Court during a subsequent hearing on a motion seeking revocation of detention order, and a motion to suppress on November 13, 1990.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

18. Giampa has lived in Western Pennsylvania his entire life. (Pretrial Services Report)

19. Before his arrest he worked for his father, who is an independent contractor, and as a personal fitness trainer. (*Id.*)

20. He lived with his parents in Dormont, Pennsylvania, until last year when he moved to his own apartment in Castle Shannon, Pennsylvania.

21. Since his arrest, Giampa's younger sister Jolie Ann Giampa has maintained that apartment. She is willing to supervise him on release, as are his parents and other sister. (Testimony of Jolie Ann Giampa.)

22. Ms. Giampa has also located a job for her brother which involves working in a gym, should he be released on bond. (*Id.*)

### Conclusions of Law

The defendant has presented two motions to the Court. First, he asks that his statements to the DEA at the time of his arrest be suppressed. Next, he asks this Court to reverse the magistrate's order that he be held without bail. For the reasons set forth below, we deny defendant's motion to suppress and grant defendant's motion to reverse the magistrate's detention order.

We turn first to defendant's motion to suppress. In his motion, defendant sets forth several theories under which his statements should be suppressed. First, he claims that the DEA agents failed to administer proper *Miranda* warnings. Second, he claims that his statements were produced as the result of illegal police coercion. The record, however, contains no evidence to support these contentions.

DEA agent Frank Schmotzer testified that after Giampa was handcuffed, he read him his *Miranda* rights from what is commonly known as a "rights card." The agent produced this card at the suppression hearing and read the rights as they appear on the card. Schmotzer further testified that Giampa indicated that he understood his rights and wanted to cooperate. Later, DEA agent Joseph Rotter, the case agent, spoke with Giampa. Before the discussion, Rotter asked Giampa if he understood his rights and Giampa indicated that he did. Thus, there is no support for Giampa's claim that he did not receive proper *Miranda* warnings.

■ The record is also devoid of any evidence that Giampa's statement was not voluntary but was the result of illegal police coercion. The following factors are relevant in determining the voluntariness of any consent: "the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment...." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (citations omitted).

■ Giampa was arrested in the hallway of a hotel in the early afternoon. Both agents testified that Giampa did not appear to be under the influence of alcohol or drugs. They also agreed that although Giampa was obviously concerned about his situation, he was neither crying nor hysterical. Instead, he intelligently and coherently informed the DEA agents that he had taken the kilo of cocaine on consignment from the government informant and intended to repay him in two weeks. As discussed above, he was advised of his constitutional rights. Moreover, the detention was not long, nor was Giampa subject to repeated questioning. Instead, he told the agents his story in approximately ten (10) minutes. Finally, there is no contention that Giampa suffered physical abuse at the hands of the DEA. There was testimony at the suppression hearing that one of the agents drew his sidearm when Giampa was first apprehended. However, because Giampa was lying face down on the floor at that time, it was unlikely that Giampa even saw the gun. Thus, there is nothing in the record to support a finding that Giampa's statement was anything other than voluntary.

We turn now to Giampa's motion to revoke Magistrate Mitchell's order that he be held without bail pending trial. The avail-

668

ability of pretrial release for Giampa is controlled by the Bail Reform Act of 1984. *See* 18 U.S.C. § 3141 *et seq.* The Bail Reform Act allows the pretrial detention of a criminal defendant pending trial if the Government can show by clear and convincing evidence that no condition of release "will reasonably assure the appearance of the person as required and the safety of any other person and the community." *See* 18 U.S.C. § 3142(e); (f); *United States v. Salerno,* 481 U.S. 739, 741, 107 S.Ct. 2095, 2098, 95 L.Ed.2d 697 (1987).

The Bail Reform Act also provides that in cases involving certain specified crimes, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community and the appearance of the defendant as required. *See* 18 U.S.C. § 3142(e). The Bail Reform Act contains a presumption against pretrial release in two circumstances. The first presumption arises as a result of the defendant's prior convictions and presumes only that no condition of release will assure the *safety* of another person and the community. *See* 18 U.S.C. § 3142(e) ¶ (1), (2), (3); *United States v. Allen,* 605 F.Supp. 864, 868 (W.D.Pa.1985). This presumption is inapplicable here.

■ The second presumption provided in Section 3142(e) arises when the defendant is charged with an offense proscribed in the Controlled Substances Act for which the maximum term of imprisonment is ten years or more. (21 U.S.C. 801 *et seq.*) This second presumption arises if there is probable cause to believe the defendant actually committed the offense with which he is charged. 18 U.S.C. § 3142(e); *United States v. Hare,* 873 F.2d 796, 798 (5th Cir. 1989); *United States v. Suppa,* 799 F.2d 115 (3d Cir.1986); *United States v. Allen,*

*supra* 605 F.Supp. at 868. In this Circuit, an indictment charging the defendant with committing a crime proscribed by the Controlled Substances Act which carries a maximum penalty of ten years or more is sufficient to support a finding of probable cause. *United States v. Suppa,* 799 F.2d at 119. The indictment in the instant case charges Giampa with violating sections 841(a)(1) and 841(b)(1)(B)(i) of the Controlled Substances Act and carries a maximum penalty of ten years imprisonment. Accordingly, a presumption arises that no condition or conditions of release will assure Giampa's presence at trial and the safety of the community.

■ Giampa may, however, rebut this presumption by presenting "some credible evidence that he will appear and will not pose a threat to the community." *United States v. Carbone,* 793 F.2d 559, 560 (3d Cir.1986). The factors relevant to this inquiry are enunciated in the Bail Reform Act as follows: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the person; (3) the history and characteristics of the accused, including the person's character, mental and physical health, family ties, employment, financial resources, length of residence in the community, community ties, and criminal history; and finally (4) the nature and seriousness of the danger to the community. *See* 18 U.S.C. § 3142(g); *United States v. Carbone,* 793 F.2d at 560–561. If the defendant rebuts this presumption, the burden shifts back to the government to prove the defendant poses a threat of flight and a threat of dangerousness to the community. *See United States v. Suppa,* 799 F.2d at 119, *United States v. Hare,* 873 F.2d at 798. *United States v. Jessup,* 757 F.2d 378, 380 (1st Cir.1985).[3]

**3.** There is some confusion in the judicial opinions regarding the quantum of proof the government must produce to secure the defendant's detention once the defendant has overcome the statutory presumption of risk of flight and dangerousness. The issue has not been squarely addressed in this Circuit. In *United States v. Allen,* 605 F.Supp. 864 (1985), Judge Diamond found that the requirement of § 3142(f) that the government prove a risk of dangerousness or

flight by clear and convincing evidence where the defendant is charged with a violation of the Controlled Substance Act does not apply. However, *Allen* discussed the quantum of proof necessary for the government to meet the presumption. It did not discuss the quantum of proof the government must produce *after* the defendant has rebutted the presumption. *Allen* is therefore inapposite.

After reviewing the evidence in the record in accordance with the guidelines set forth in the Bail Reform Act, we find that Giampa has rebutted the statutory presumption. First, Giampa has no prior criminal record. Second, Giampa is 27 years old and has lived his entire life in the Western District of Pennsylvania. Third, Giampa has a history of steady employment. He has worked in his father's construction business since graduating from high school in 1981. He has also worked as a personal fitness trainer for the past 2 years.

The record also demonstrates that he has close ties to his family. As indicated above, Giampa has worked with his father for the past nine years. Until last year, he lived with his parents. Giampa's younger sister Jolie testified that since his arrest, she has maintained his apartment and would offer to help her brother post a bond and supervise her brother if he were released. She indicated that her parents were also willing to provide support. She also testified that she has found someone willing to employ Giampa should he be released. Finally, the DEA agents who arrested Giampa testified that upon his arrest, Giampa expressed concern about his parents' reaction to his arrest because his brother had been murdered in a drug-related incident last year. Giampa was concerned because that incident and a subsequent trial caused a great deal of stress for his family. That apparent concern, which we take to be genuine, further supports a finding of a close relationship between Giampa and his parents.

The evidence also refutes any presumption of a risk of flight. When it enacted the Bail Reform Act, Congress held hearings and concluded that defendants involved in drug trafficking posed a peculiar risk of flight. It found that drug traffickers often establish contacts in other countries which would allow them to flee with relative ease. Moreover, due to the lucrative nature of drug trafficking, Congress concluded that the forfeiture of a bond is simply a cost of doing business. *See generally* S.Rep. No. 225, 98th Cong. 1st Sess. 20 (1983) *reprinted in* 1984 U.S.Code Cong. & Admin.News pp. 23–24; *See also United States v. Jessup,* 757 F.2d at 380–385. Although it may very well be true that many accused of drug trafficking pose a particular threat of flight, this generalization cannot be inflexibly applied to every case; nor do we believe it is applicable to this case.

First, Giampa has lived in the Western District of Pennsylvania his entire life. Second, he has spent his entire adult life working with his father for approximately $240 per week. His only assets are $400 in a checking account and a Pontiac valued at approximately $200. Giampa hardly fits the mold of the international narcotics trafficker with whom Congress was most concerned. The record negates any contention that Giampa has either the resources or the contacts that would enable him to flee the country with ease.

We must also consider the nature and circumstances of the offense, the weight of evidence against the defendant, and the seriousness of the danger to the community. At first blush, the nature of the offense weighs heavily in favor of the presumption, as Congress expressed particular concern over the risks attendant to pretrial release of those accused of narcotic offenses. However, as the reasons set forth above indicate, we find Giampa is differently situated than the drug trafficker Congress contemplated when it enacted the Bail Reform Act.

Similarly, the circumstances surrounding the offense, together with the weight of the evidence, also rebut any presumption

---

The First Circuit confronted the issue in *United States v. Jessup,* 757 F.2d 378, 380–84 (1985), and held that the presumption in § 3142(e) merely places a burden of production on the defendant. Once the defendant meets this burden of production, the burden of persuasion falls to the government. Section 3142(f) states that the government must satisfy this burden of persuasion with clear and convincing evidence. 18 U.S.C. § 3142(f). We therefore find that if a defendant charged with a violation of the Controlled Substances Act rebuts the presumption, the government must then prove a risk of flight or danger to the community by clear and convincing evidence before the defendant can be held without bail.

**670**

against pretrial release for Giampa. Giampa, who has no criminal record, was apprehended during a government sting operation. A confidential informant, who cooperated with the government in hope of obtaining more lenient treatment, called Giampa and asked him to meet him at a hotel. The informant then produced a kilo of cocaine to sell Giampa. When Giampa indicated that he had no money, the informant gave Giampa the kilo on consignment.

We must finally turn to the seriousness of the danger to the community if Giampa is not detained pending trial. In the context of the instant case, the Court perceives dangerousness to the community to mean the risk that Giampa will engage in further drug trafficking while on release pending trial. There is little in the record to support this conclusion. Giampa has no record and does not appear to live the life of a serious drug dealer. Moreover, there is nothing to suggest that he has the means or contacts to procure narcotics. Even if the informant's story were deemed wholly credible, there would still be no showing of future dangerousness. The fact that the informant might have supplied Giampa in the past is irrelevant to this issue because the informant has chosen to cooperate with the government and hence, is no longer involved in narcotics trafficking. There is nothing to support a finding of future dangerousness.

In summary, we find that the indictment gave rise to a presumption that Giampa should be detained without bail. Giampa's life long residence in Western Pennsylvania, close ties to his family, steady employment history, and the fact that he might be able to find employment at a local gym if he were released rebut the presumption that no condition or combination of conditions could reasonably assure the safety of the community and his presence at trial. The burden of persuasion then fell upon the government to prove by clear and convincing evidence that Giampa should be detained pending trial. The government has failed to meet this burden. Therefore, we will reverse the Magistrate's detention order.

An appropriate order setting forth the conditions of release will be issued.

## ORDER

AND NOW, this 5th day of December, 1990, in accordance with the memorandum filed today, it is hereby

ORDERED that the order directing pretrial detention of defendant James Francis Giampa is REVOKED and that defendant Giampa be released subject to the following conditions:

(1) that the defendant post bail in the amount of $50,000 with $5,000 cash and the remainder secured by bond or property located in the Commonwealth of Pennsylvania as provided by Local Rule 25;

(2) that defendant live with his parents pending trial and observe a curfew of 10:00 p.m. to 6:00 a.m.;

(3) that defendant attempt to secure gainful employment;

(4) that defendant not leave the Western District of Pennsylvania;

(5) that the defendant report to Pretrial Services each Monday, Wednesday and Friday by telephone;

(6) that the defendant undergo drug testing as directed by Pretrial Services;

(7) that the defendant not commit any Federal, State, or local crime while on release;

(8) that the defendant refrain from possessing any firearm or any other dangerous weapon or destructive device; and

(9) any failure by the defendant to comply with the aforementioned conditions of bail will result in the revocation of bail and an order directing pretrial detention for defendant.

Defendant is also advised that any failure to comply with these conditions may result in a subsequent prosecution for contempt of court and the immediate issuance of a warrant for the defendant's arrest. It is further

ORDERED that defendant is advised that if he is convicted of any offense committed while on release pursuant to this

Order, he shall be sentenced in addition to the sentence for that offense to the following:

1. A term of imprisonment of not more than ten years if the offense is a felony; or

2. A term of imprisonment of not more than one year if the offense is a misdemeanor.

3. Any term of imprisonment imposed pursuant to the above provisions shall be consecutive to any other term of imprisonment.