**UNITED STATES of America**

v.

**Eduardo Antonio LOPEZ, et al., Defendants.**

**Crim. No. 92–566.**

United States District Court, D. New Jersey.

June 11, 1993.

Jean D. Larosiliere, Asst. U.S. Atty., Newark, NJ, for U.S.

Alan Silber, Hayden, Perle & Silber, Weehawken, NJ, for defendant Lopez.

### OPINION

WOLIN, District Judge.

Before the Court is the motion of defendant Eduardo Antonio Lopez ("Lopez") for review and reversal of the magistrate judge's denial of his motion to vacate the detention order and set conditions of release. For the

reasons expressed below, the Court will grant defendant's motion.

## BACKGROUND

Lopez was arrested on September 30, 1992 on charges relating to the trafficking of cocaine. On October 9, 1992, he appeared, along with two codefendants, before United States Magistrate Judge Hedges for a detention hearing. Judge Hedges detained Lopez on the ground of risk of flight, citing the absence of employment ties and the limited properties offered on his behalf. Lopez appealed, and Judge Wolin assigned the matter to United States Magistrate Judge Pisano.

After a two-day hearing on November 24, 1992 and December 1, 1992, Judge Pisano refused to disturb the original detention order. He found that defendant had not rebutted the statutory presumption required for his release, citing the seriousness of the offense and the correspondingly severe penalties as suggestive of danger and flight. On May 6, 1993, Judge Hedges denied defendant's motion to revoke the detention order, concluding that defendant's close family ties did not overcome his role in the drug conspiracy. A review of this motion currently is pending before the Court.

## DISCUSSION

### A. Standard of Review

■ A district judge's review of a magistrate's denial of bail is de novo. *See United States v. Delker*, 757 F.2d 1390, 1394–95 (3d Cir.1985). While such courts may do more than examine the transcript of the hearing before the magistrate, *id.* at 1394, in most cases they find it useful to consider carefully the reasoning and decision of the magistrate. *Id.* at 1395. Thus, the Court must make an independent determination of Lopez's right to bail, fully explaining the result it reaches and its reasons. *Id.*

### B. The Bail Reform Act

■ Courts must strive to impose the least restrictive bail conditions necessary to assure the appearance of defendant at trial and the safety of the public in the interim between arrest and trial. *See United States v. Himler*, 797 F.2d 156, 159 (3d Cir.1986). Yet section 3142(e) of title 18 of the United States Code recognizes the necessity of detention in certain circumstances, providing:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial.

18 U.S.C. § 3142(e). Indeed, Congress isolated categories of crimes in which detention more frequently will be appropriate.

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (12 U.S.C. 951 et seq.), the Maritime Drug Law Enforcement Act (46 U.S.C.App.1901 et seq.), or an offense under section 924(c) of title 18 of the United States Code.

*Id.*

■ The government bears the burden of persuading the court that a defendant should be detained. Depending on the crime alleged and the corresponding proof, the government enjoys a presumption of nonappearance and dangerousness. Defendant may rebut this presumption by presenting "some credible evidence forming a basis for his contention that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir.1986). If the defendant meets this burden of production, the burden shifts back to the government to prove a risk of flight by a preponderance of the evidence, *see Himler*,

797 F.2d at 161,[1] and dangerousness by clear and convincing evidence. *See* 18 U.S.C. § 3142(f).

Subsection (g) of section 3142 specifies the factors that control these determinations. It directs the Court to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the nature and seriousness of the danger to any person or to the community that would be posed by the person's release; and (4) the history and characteristics of the person including his family ties, employment record, community ties, history of drug or alcohol abuse, criminal history, and whether at the time of the offense or arrest he was on probation or parole. *Id.* § 3142(g).

■ Because a grand jury found probable cause to indict Lopez for an offense which carries a maximum term of imprisonment of ten years or more under the Controlled Substances Act, the Court must presume that he is both unlikely to appear at trial and dangerous to the community. *See United States v. Suppa,* 799 F.2d 115, 119 (3d Cir.1986). To counter these damaging conclusions, defendant offers residential property and a bond to secure bail, describes his close family and community ties and submits a strict home detention plan. The Court will outline each in turn.

Five families have offered four homes with a collective equity value of two hundred, forty-nine thousand five hundred dollars ($249,500) to help secure defendant's release. They include: (1) Peter and Virginia Guadagnino who own a two-family house in Jersey City, New Jersey with an equity value of one hundred twenty-seven thousand, five hundred dollars ($127,500); and (2) Richard and Maria Tuero and Eddy and Juana Tuero who own a two-family dwelling and retail building in Union City, New Jersey with an equity value of one hundred and three thousand dollars ($103,000); (3) Heriberto and Amarili Varela and Jose and Elsa Martinez who own a three-family house in Newark, New Jersey with an equity value of ten thousand dollars ($10,000); and (4) Eddy and Juana Tuero who own a two-family dwelling in Union City, New Jersey with an equity value of nine thousand dollars ($9,000). In addition, defendant will post a corporate security bond in the amount of two hundred thousand dollars ($200,000).

With respect to family and community connections, the facts show that defendant is a long-time resident of this New Jersey district. He and his wife Irene have been married for seventeen years, and they have a thirteen-year-old son, David. The Lopez family currently rents an apartment located at 1600 75th Street in North Bergen, New Jersey.

Born in Cuba in 1956, the oldest of four children, defendant emigrated to the United States in 1967, living in Los Angeles until 1971, when his family moved to West New York, New Jersey. Since his marriage, defendant has resided in New Jersey with the exception of the years from 1984 to 1990 when he and his family lived in Tampa, Florida.

Defendant's extended family also resides in New Jersey, with one sister in Edison, another in North Bergen, and his mother in West New York.[2] They describe him as the titular head of the family, who visits his ailing mother almost daily and provides guidance and support to his siblings. Defendant also is active in his son's school activities.

Under the terms of the proposed home detention, defendant would remain at his residence under strict monitoring. He would be permitted to leave his home to visit the office of his attorney, in the case of medical emergencies and to work.[3] A tripartite monitor-

---

**1.** But see *United States v. Giampa,* 755 F.Supp. 665, 668 n. 3 (W.D.Pa.1990) (government must prove risk of flight or dangerousness by clear and convincing evidence), *aff'd,* 947 F.2d 938 (3d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1238, 117 L.Ed.2d 471 (1992).

**2.** Defendant's father died in 1979. Defendant's brother resides in Florida.

**3.** Jorge Garcia, the manager of The Crib Outlet, a children's furniture distributor in Union, New Jersey, has offered defendant a sales position at the company. Under defendant's plan, he would work during hours prescribed by Pre-Trial Services. NCIA would monitor his presence at work, and he would be provided minimal travel time from his home to and from work.

ing system is envisioned, comprised of the National Center on Institutions and Alternatives ("NCIA"), a private nonprofit agency that serves criminal justice clients nationwide, a team of third-parties and Pre–Trial Services. The NCIA will shoulder the greatest burden, placing a minimum of six random calls in every twenty-four hour period to the Lopez residence to verify the defendant's presence.[4] NCIA will record these calls in a log to be submitted periodically to Pre–Trial Services.

The third-party monitoring team also will supervise defendant's detention. The suggested group includes: (1) A. William Pingpank, M.D., who has known the Lopez family for fourteen years and served as David's pediatrician since his birth; (2) Arthur M. Flaherty, a Metuchen police officer and brother-in-law of defendant; (3) Reverend Edward C. Puleo, the spiritual advisor of the Lopez family; (4) Francisco Munin, the owner and occupant of the two-family house in which the Lopez family rents their apartment; (5) Marcelo R. Viera, godfather to defendant's son; and (6) Jorge Garcia, manager of a business known as The Crib Outlet who has offered Lopez employment during his release pending trial.

Additional conditions will ensure that defendant has limited access to the community. NCIA will supervise the installation of a New York Telephone Centrex III Account which would allow the Court to restrict the outgoing calls from and the incoming calls to the Lopez residence. Portable and cellular phones would be prohibited in the household as would direct or indirect communication between Lopez and anyone by letter or facsimile without prior notice to Pre–Trial Services and the Office of the United States Attorney. Only those visitors the Court approves will be permitted on the premises. Foreign travel is prohibited as well as the application for a passport or other documents that would permit such activity.

The Court is satisfied that defendant has rebutted the statutory presumption of dangerousness and flight risk. Turning first to dangerousness, the rigorous conditions of the proposed home detention shields defendant from the community, thereby removing the opportunity for him to participate in criminal activity while he awaits trial. Other factors that indicate that defendant's release will not imperil the community are the absence of any prior criminal record and the defendant's comparatively limited role in the alleged conspiracy.[5]

Defendant also is successful in countering the appearance element. His relatives use superlatives to describe the closeness of their extended, New Jersey-based family. Friends of the family have pledged their own homes, valued close to $450,000, as security for defendant's appearance. In addition, some twenty-seven friends and neighbors have written to the Court on behalf of Lopez.

The government has offered little evidence to meet its burden of proving by clear and convincing evidence that Lopez is dangerous. It relies on the gravity of the crime charged and its "exceedingly strong" evidence against Lopez. Although the seriousness of defendant's activities is compounded by the amount of the contraband seized, Congress did not rely on the quantity of drugs involved as a measure of the propriety of pre-trial detention. By focusing heavily on the number of kilos of contraband, the Court thereby would rewrite section 3142 to preclude all defendants charged with large-quantity distribution schemes from obtaining release.

Nor can the Court discern facts that would support a finding of dangerousness. No violent incident marks the execution of the conspiracy or the government's attempted ap-

---

4. During the course of each NCIA call, a thermal printer will reproduce an image of defendant as he appears on the video screen of the Luma Telecom unit. This image will indicate the date and time the call is placed and the telephone number called. These images also will be submitted to Pre–Trial Services.

5. In so concluding, the Court does not intend to cast doubt on the strength of the government's case against Lopez. Rather, the Court notes that defendant appears in only two of the twenty-three audio recordings made by agents throughout the course of their three-month investigation. While present in the vehicle that eluded governmental agents, defendant was not its driver. These facts suggest that defendant served as a mule who enjoyed little decision-making authority.

prehension and arrest of defendant. Defendant carried no weapon. His comparatively limited involvement also weighs in his favor. Because the government fails to carry its burden the Court concludes that defendant is not dangerous.

In contrast, with respect to the risk of flight prong, the government raises numerous arguments. First, attempting to discredit defendant's family-ties argument, the government argues that Lopez was estranged from his wife and child at the time of and prior to his arrest. To support this conclusion the government relies on a lease to an apartment at Riverview Circle, North Bergen, found in his possession and bearing his name. An invoice for drapes for the apartment, also in the name of Lopez, was seized during the search of the premises.

These scant facts do not support a finding of estrangement. Cautious landlords often restrict their tenancies to reliable renters. Moreover, whether a matter of business or convenience it is not unusual in our modern, highly-mobile society for individuals to maintain dual residences. At best, the record supports an inference that Lopez and his codefendant used the apartment as a safe house.

The government next focuses on defendant's behavior prior to arrest when, in its view, defendant fled from federal agents during an automobile chase. Because the agents used no sirens, overhead lights or loudspeakers to notify defendant that he was a target of pursuit, his alleged disregard of authority is unclear. Even though the government's confidential informant believes that defendant was aware of the surveillance, the Court thinks this sequence of events is better described as an attempt to escape detection rather than an attempt to flee which does not supply much force to the government's position.

The government also urges the Court to discount the property produced by the friends of defendant, since they likely are members of or pawns recruited by the "organization" who have been promised indemnification against or perhaps compensation for any possible loss resulting from defendant's release. The government has produced no evidence in support of this theory, and the Court is unwilling to engage in such cynicism absent some cause. Nevertheless, in order to clear the cloud of doubt caused by this suggested deceit, the Court will conduct a hearing and under oath permit the government to question the property owners about their motives.

More troublesome are the events surrounding Lopez's arrest. At the time he was taken into custody, defendant possessed a driver's license, social security card and an employer identification card in the name of Ruben Olmos. During an interview with pre-trial services defendant Lopez falsely identified himself to these government agents. Once counsel was present, however, defendant ceased any attempt to camouflage his true identity.

The government argues that this behavior illustrates the tendency as well as the capacity to flee. Defendant uses these facts to demonstrate his naivety and his desire to protect his family from embarrassment and shame. Both arguments are exaggerated. While the use of false identification is suspect and reprehensible, even coupled with the government's other arguments, now largely discredited by the Court, this behavior is not determinative and cannot support the conclusion that defendant will avoid justice. Defendant has exhibited plural, rather than multiple, identities,[6] suggesting that he possesses no heightened deceptive abilities that would allow him to evade capture should he decide to flee. Indeed, the Ruben Olmos avenue of escape has been foreclosed.

Thus, the Court concludes that the government has failed to meet its burden of showing by a preponderance of the evidence that defendant will not appear at trial if released

---

**6.** The government also notes that "in reviewing some of the evidence obtained from the 12 D Riverview apartment, the following names, ... [Eduardo Gomez and Ricardo A. Haedo] have been associated with the defendant." Letter to the Court from J.D. Larosiliere, Assistant U.S. Attorney (June 9, 1993). However, there is no evidence to support an inference that defendant utilized these names as false identities. Nor can they be tied exclusively to defendant, since there is no dispute that another defendant also used the subject apartment.

as required under section 3142. Due process concerns also drive this decision. The Third Circuit has recognized that at some point during pre-trial confinement due process may require release or, "at a minimum, a fresh proceeding at which more is required of the government than is mandated by section 3142." *United States v. Accetturo,* 783 F.2d 382, 388 (3d Cir.1986). Almost eight months have passed since defendant's arrest in October 1992. The prolonged incarceration of Lopez necessarily is troublesome, especially where, as here, discovery has not been completed, and there is evidence that it will continue to proceed slowly.[7]

Although the Court reaches a conclusion at odds with those of Magistrates Hedges and Pisano, this result does not evidence a disrespect for these judges or a disregard of their findings. Rather, the inapposite ruling reflects different records marked by radically changed circumstances. Most obvious is the timing element, but the Court also benefitted from additional security for bail, a more detailed plan for home detention and greater information about the government's case against defendant.

For the reasons stated above, the Court will release defendant and order home detention but withhold permission to work. The government objects to this action and asks the Court either to retain defendant or to release him with few conditions, arguing that the home should not serve as a substitute for prison. This characterization is inapposite. While bail traditionally serves to secure appearance at trial, in the Bail Reform Act, Congress articulated a second concern, protecting the public from post-arrest violations of the law. Incarceration necessarily accomplishes both goals. In cases in which neither concern is present, home detention with work release is appropriate. In cases, such as this, where a defendant satisfies the court

that flight is unlikely, strict home detention serves to shield the community from the danger posed by defendant's continued criminal activity.

### CONCLUSION

The Court will grant defendant's motion and vacate the detention order and set conditions of release. The Court will stay its decision pending a hearing at which the appraiser, the bondsman and the owners of the property posted to secure defendant's release shall appear and testify. A discussion of the specific conditions of release also will await this hearing.

### *ORDER OF RELEASE*

In accordance with the Court's Opinion signed June 11, 1993,

It is on this 17th day of June, 1993, hereby ORDERED that

1. Bail shall be fixed at four hundred, forty-nine thousand, five hundred dollars ($449,500), and defendant shall be released upon:

(a) the execution of a corporate surety bond in the amount of two hundred thousand dollars ($200,000); and

(b) the execution of a noncorporate surety bond in the amount of two hundred, forty-nine thousand, five hundred dollars ($249,500) which is supported by the equity value [1] of the following real properties: (1) the two-family house owned by Peter and Virginia Guadagnino and located at 152 Bentley Avenue, Block # 1814, Lot # 3–A, Jersey City, Hudson County, New Jersey with an equity value of one hundred, twenty-seven thousand, five hundred dollars ($127,500); (2) the two-family dwelling and retail building owned by Richard and Maria Tuero and Eddy and Juana Tuero and located at 201–203 44th

---

7. During oral argument, counsel for defendant revealed that the government has assigned the document production tasks to a single agent of the Drug Enforcement Agency who is able to devote time to this task only outside regular workday hours. As such, the government's current request for detention borders on cavalier in light of their refusal or inability to devote adequate resources to prepare this case for trial. Further, while these matters necessarily extend

the time limit imposed by the Speedy Trial Act, the specter of its seventy-day provision haunts the Court.

1. Pursuant to its power under United States District Court Rule 1A, the Court hereby waives United States District Court Rule 35C.3(c) which requires that the equity offered must be at least twice the amount of the bond.

Street, Block # 252, Lots # 22 & # 23, Union City, Hudson County, New Jersey with an equity value of one hundred and three thousand dollars ($103,000); (3) the three-family house owned by Heriberto and Amarili Varela and Jose and Elsa Martinez and located at 313 Summer Avenue, Block # 576, Lot # 43, Newark, Essex County, New Jersey with an equity value of ten thousand dollars ($10,000); and (4) the two-family dwelling owned by Eddy and Juana Tuero and located at 205 44th Street, Block # 252, Lot # 21, Union City, Hudson County, New Jersey with an equity value of nine thousand dollars ($9,000).

And it is further ORDERED that in addition to the above requirements, the following conditions of release are imposed:

1. Defendant shall remain at all times in his home, located at 1600 75th Street, North Bergen, New Jersey ("the Lopez residence").

2. Defendant's presence at the Lopez residence shall be monitored by the National Center on Institutions and Alternatives ("NCIA"). The NCIA shall place a minimum of six random calls in every twenty-four hour period to the Lopez residence to verify the defendant's presence. The NCIA shall record these calls in a log and submit the log to Pre–Trial Services on the Monday of each week. During the course of each NCIA call, a thermal printer shall reproduce an image of defendant as he appears on the video screen of the Luma Telecom unit. This image shall indicate the date and time the call was placed and the telephone number called. These images also shall be submitted to Pre–Trial Services on the Monday of each week.

3. Defendant shall be permitted to leave his home for two purposes: (1) to visit the office of his attorney, Alan Silber, Esq., located at 1500 Harbor Boulevard, Weehawken, New Jersey; and (2) to seek care in the case of a medical emergency. In both instances Lopez shall give prior notice to the Assistant United States Attorney, Pre–Trial Services and the NCIA. Defendant also shall call the office of the United States Attorney when he leaves and returns to his residence and when

he arrives at and leaves the office of his attorney or the appropriate medical facility.

4. A third-party monitoring team shall be established to supervise defendant's home detention. The group shall include: (a) A. William Pingpank, M.D., family friend and physician; (b) Arthur M. Flaherty, a Metuchen police officer and brother-in-law of defendant; (c) Reverend Edward C. Puleo, the spiritual advisor of the Lopez family; (d) Francisco Munin, the owner and occupant of the two-family house in which the Lopez family rents their apartment; and (e) Marcelo R. Viera, long-time friend of defendant and the godfather of defendant's son. At least one member of this monitoring team shall visit the Lopez residence each day. A log of these visits shall be kept recording the date and time of each visit and the signature of the visitor. This log shall be submitted to Pre–Trial Services on the second and fourth Mondays of each month. In addition, a member of the monitoring team, other than Mr. Flaherty, shall accompany defendant at all times during his absences from the Lopez residence authorized in paragraph three.

5. Visitors to the Lopez residence shall be limited to those persons named in the following list:

(a) A. William Pingpank, M.D., third-party monitor;

(b) Arthur M. Flaherty, third-party monitor;

(c) Reverend Edward C. Puleo, third-party monitor;

(d) Francisco Munin, third-party monitor;

(e) Marcelo R. Viera, third-party monitor;

(f) Milagros Pera Lopez, defendant's mother;

(g) Magarita Flaherty, defendant's sister; and

(h) Milagros Alonso,[2] defendant's sister.

6. The NCIA shall supervise the installation of a New York Telephone Centrex III Account which shall restrict the outgoing calls from and the incoming calls to the Lopez residence in accordance with the following list:

(a) Family members:

---

2. Milagros Alonso is not related to the codefendant Ramon Alonso.

(1) Milagros Pera Lopez, (201) 867–1409;

(2) Magarita Flaherty, (908) 985–1096;

(3) Milagros Alonso, at home: (201) 869–0954 and at work: (201) 861–9100;

(4) Milta Gil, defendant's aunt, (201) 866–5715;

(5) Julia and Heleodoro Barrios, defendant's mother and father-in-law, (201) 869–8677;

(6) Minita Bode, defendant's sister-in-law, (201) 869–4370; and

(7) Irene Lopez at work—(201) 868–1960, ext. 1209.

(b) Third Party Monitors:

(1) A. William Pingpank, M.D., (201) 943–2244;

(2) Arthur M. Flaherty, (908) 985–1096;

(3) Reverend Edward C. Puleo, (908) 548–0100;

(4) Francisco Munin, (201) 869–1574; and

(5) Marcelo R. Viera, (201) 694–6458.

(c) Emergency and Medical:

(1) Emergency—911

(2) Fire Department—(201) 864–8000

(3) Police Department—(201) 392–2100, and

(4) Ambulance—(201) 392–3979.

(d) Legal Services:

(1) Pre–Trial Services—(201) 645–2230

(2) Hayden, Perle & Silber—(201) 617–5522

(3) Alan Silber—(212) 924–4831

(4) Todd Hess—(908) 709–0248

(5) Samuel Guiberson, Esq.—(713) 520–7200 and

(6) Joel Sickler, NCIA—(703) 684–0373.

7. No portable or cellular phones shall be permitted in the Lopez residence.

8. Unless otherwise indicated in paragraphs five or six, defendant shall have no direct or indirect communication with any person by letter or facsimile or otherwise without prior notice to Pre–Trial Services and the Assistant United States Attorney.

9. Should the need arise, defendant may apply to the Court for permission to access additional visitors and telephone numbers on a one-time basis with prior notice to Pre–Trial Services and the Assistant United States Attorney.

10. Defendant shall be prohibited from engaging in out-of-state or foreign travel. Defendant shall surrender his passport and shall not apply for a passport or other documents that would permit foreign travel.

11. Defendant shall not attempt to influence, intimidate or injure any juror or judicial officer; nor tamper with any witness, victim or informant; nor retaliate against any witness, victim or informant in this case.

12. Upon discovery of a violation of the above conditions of release, the NCIA immediately shall report such violation to Pre–Trial Services, the Assistant United States Attorney and the Court.

And it is further ORDERED that defendant shall be furnished with a copy of this Order of Release and a notice of the penalties applicable to violations of the conditions of his release.